*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0268p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ALLEN ST. JOHN,

           *Plaintiff-Appellant,*

      *v.*

DAVID HICKEY, Sheriff, Vinton County, Ohio, in his individual and official capacities; CHARLES BOYER, Corporal, Vinton County Sheriff's Department, in his individual and official capacities; GREG WOLFE, Officer, Vinton County Sheriff's Department, in his individual and official capacities,

           *Defendants-Appellees.*

No. 04-3388

---

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 02-00682—Edmund A. Sargus, Jr., District Judge.

Argued: March 16, 2005

Decided and Filed: June 20, 2005

Before: DAUGHTREY and CLAY, Circuit Judges; SCHWARZER, District Judge.[*]

---

## COUNSEL

**ARGUED:** Zach Zunshine, Columbus, Ohio, for Appellant. Randall Lee Lambert, LAMBERT, McWHORTER & BOWLING, Ironton, Ohio, for Appellees. **ON BRIEF:** Zach Zunshine, Columbus, Ohio, for Appellant. Randall Lee Lambert, LAMBERT, McWHORTER & BOWLING, Ironton, Ohio, for Appellees.

---

## OPINION

---

    CLAY, Circuit Judge. Plaintiff Allen St. John appeals the district court's grant of summary judgment to Defendants David Hickey, the Sheriff of Vinton County, Ohio, and two of his deputies, Corporal Charles Boyer and Officer Greg Wolfe with respect to St. John's excessive force and wrongful arrest claims, which he brought under 42 U.S.C. § 1983 against Defendants in their

---

[*]The Honorable William W Schwarzer, United States District Judge for the Northern District of California, sitting by designation.

1

individual and official capacities. We conclude that St. John, who suffers from muscular dystrophy and is wheelchair-bound, has produced evidence sufficient to create genuine issues of material fact as to whether Defendants had probable cause to arrest him and as to whether they used excessive force in attempting to place him in the back seat of a police cruiser after he explained that his legs could not bend. We further conclude that the facts as alleged by St. John suggest the violation of a clearly established right such that Defendants are not entitled to qualified immunity. Finally, we conclude that, as to his official capacity claim, St. John has failed to produce any evidence tending to show that Sheriff Hickey and Vinton County failed to train their officers in a manner that constitutes deliberate indifference to citizens' constitutional rights. Accordingly, we AFFIRM in part and REVERSE in part.

## I. BACKGROUND

This case arises out of an acrimonious dispute between neighbors in the small town of Hamden, Ohio, which is located in Vinton County. Because the case comes to this Court following entry of summary judgment in favor of Defendants, we consider the facts in the light most favorable to St. John. Between the spring and fall of 2000, St. John, confined to a wheelchair by his muscular dystrophy, frequently complained to the Vinton County Sheriff's Department that members of the McManus family were parking on his grass and hitting his trash cans with their cars. The McManuses, who lived across the street from St. John and his family, had refused St. John's requests to cease these practices. St. John alleges that members of the McManus family, including six adult children, had begun to threaten him. These threats peaked when St. John took his grievance to the city council, who ruled that the McManuses were to park only on their side of the street and St. John only on his. When Jesse McManus died in June 2000, several of his sons and relatives surrounded St. John's car, preventing him from exiting. Keith McManus, Jesse's son, threatened to "put a bullet between [St. John's] eyes."

In the wake of these threats, St. John became concerned for his safety and decided to install security lights on his garage. During June 2000, the McManuses complained about the lights to Sheriff David Hickey, a defendant herein. Hickey came to St. John's house, informed him of the complaints and, at St. John's suggestion, adjusted the lights. On October 27, 2000, St. John was charged by Corporal Boyer of the sheriff's department, also a defendant herein, with disorderly conduct on the grounds that the lights were bothering several neighbors, including the McManuses. On November 2, 2000, St. John was again charged with disorderly conduct, this time for blocking Dale McManus's car while in his wheelchair.

On November 9, 2000, Mrs. McManus complained to Sheriff Hickey that St. John's lights were again shining on her house. Hickey instructed Boyer to assess whether the lights were pointed in the same direction as when Boyer had cited St. John for disorderly conduct on October 27, 2000; Boyer confirmed that they were. In addition, Hickey spoke with Mrs. McManus who alleged that St. John had added another light on his garage such that two lights were now focused at the McManus residence. At his deposition, Hickey testified that "[t]he front of the McManus' house was brightly lit due to the lights. I asked Ms. McManus to turn her inside lights in the living room off. The flood lights [from St. John's garage] illuminated the living room."

Hickey and Boyer then proceeded to St. John's house, knocked on the door, and were permitted to enter by St. John's wife. St. John insisted that he had not adjusted the lights in any way since the day in June when Hickey adjusted them. According to Hickey, St. John used profanities and refused to shut off the lights without written assurance from the Sheriff that he and his family would be safe. Hickey said he could not make such a promise and threatened to arrest St. John if he refused to shut off the lights. Hickey then prepared to issue a citation to St. John but St. John refused to provide the necessary information; however, St. John's wife offered the information and St. John himself cooperated after Hickey explained that he could be charged with obstruction of

justice. St. John instructed his wife to turn the lights off but when another officer arrived, officer Greg Wolfe, St. John instructed his wife to turn them back on. The officers then arrested St. John. Hickey asked St. John's wife for St. John's medication, which she provided. Boyer and Officer Wolfe carried St. John, while in his wheelchair, out of the house through the front door. Because there was a step to negotiate on the way out, the officers turned the wheelchair around and proceeded backwards. As they did this, St. John fell out of the wheelchair. The officers picked St. John up, placed him back in his wheelchair, and proceeded to a waiting police cruiser.

When they arrived at the cruiser, St. John explained that he could not fit in the back seat because he was unable to bend his legs. Officer Wolfe replied that he had successfully placed much bigger men in the back seat of the cruiser. The officers then attempted to put St. John into the back seat but were not able to do so because St. John's leg became caught between the rear door and the body of the cruiser. This caused injury to St. John's leg. As the officers attempted to remove St. John from the cruiser and return him to the wheelchair they twice dropped him. By now St. John was having difficulty breathing and the officers called paramedics to transport him to a hospital.

At his deposition, Sheriff Hickey admitted that he knew there was a wheelchair ramp attached to the back of St. John's house but did not explain why the officers nevertheless elected to exit through the front door. In addition, Hickey acknowledged that as of November 9, 2000, St. John's October disorderly conduct charge relating to his lights was still pending before a county court. Further, Hickey acknowledged that with the assistance of St. John's wife, he had been provided all the necessary information to issue a citation for disorderly conduct. Consequently, Hickey admitted that an arrest was not strictly necessary; the matter could have been left to the county court. However, each of the officers confirmed that the conversation between Hickey and St. John that preceded St. John's arrest quickly escalated into a loud and argumentative confrontation, with St. John using obscenities. Hickey testified that St. John's conduct justified an elevated charge of disorderly conduct in the fourth degree and that it was clear to him that St. John was intent on disobeying Hickey's request to turn the lights off. Hickey, therefore, determined that an arrest was justified. The parties agree that when St. John was taken to the hospital, he was no longer under arrest. Finally, on March 15, 2001, the state of Ohio dismissed Hickey's disorderly conduct charges from October 27, 2000 and November 9, 2000.

St. John brought this action under 42 U.S.C. § 1983 in the Southern District of Ohio, naming Sheriff Hickey, Corporal Boyer, and Officer Wolfe as defendants in their official and individual capacities. In his first amended complaint, dated January 6, 2003, St. John alleged the officers "recklessly disregarded" his rights under the Fourth and Fourteenth Amendments to the Constitution. St. John also generally alleged violations of state law. St. John alleged that Defendants' conduct caused him "humiliation, indignity, pain and suffering, incurred medical bills, attorney's fees as well as severe emotional distress and emotional trauma." After discovery, Defendants moved for summary judgment, which the district court granted. The district court construed St. John's claim as alleging lack of probable cause and excessive force. The court held that St. John had failed to establish either the existence of a Vinton County custom or policy that resulted in his allegedly unreasonable arrest or that the county failed to adequately train the Sheriff's department's officers and consequently was deliberately indifferent to St. John's Fourth Amendment rights. The district court accordingly granted summary judgment to Defendants in their official capacities.

As for the individual capacity claims, the district court held that Defendants did not use excessive force in their arrest of St. John. The court observed that none of the Defendants' decisions as they removed St. John from his house and attempted to place him in the cruiser were objectively unreasonable. Nor were the mishaps that occurred the result of excessive force; rather, the district court reasoned, "[a]t best, the plaintiff has demonstrated negligence, but not excessive use of force." Finally, the district court held that Hickey and his colleagues had probable cause to arrest St. John

because his persistent lack of cooperation elevated the initial disorderly conduct offense to fourth degree disorderly conduct, an arrestable offense under Ohio law. Accordingly, the district court granted summary judgment to Defendants in their individual capacities and dismissed St. John's state law claims without prejudice.

On appeal, St. John again asserts that (1) Hickey and his colleagues lacked probable cause to arrest him; (2) the officers used excessive force during the arrest; and (3) Vinton County's failure to train its Sheriff's Department regarding how to properly arrest handicapped suspects constitutes deliberate indifference to those suspects' constitutional rights.

## II. STANDARD OF REVIEW

St. John appeals the grant of summary judgment to Defendants. This Court reviews a district court's decision to grant summary judgment *de novo*. *E.g., Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1048 (6th Cir. 2001). Summary judgment shall be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The district court, and this Court in its review of the district court, must view the facts and any inferences reasonably drawn from them in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Accordingly, this Court must review the facts in the light most favorable to St. John. Finally, in conducting a review of the facts, "[t]he proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

## III. DISCUSSION

### A.      Qualified Immunity

Section 1983 authorizes anyone deprived of her federal constitutional or statutory rights by state officials to bring a civil action for damages against such officials. 42 U.S.C. § 1983. However a defendant in a § 1983 action may raise the affirmative defense of qualified immunity, which "shields 'government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known.'" *Gardenhire v. Schubert*, 205 F.3d 303, 310-11 (6th Cir. 2000) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

But as a precursor to the *Harlow* qualified immunity analysis, a court must first determine whether *any* constitutional violation occurred, let alone the violation of a clearly established right. *E.g., Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Jackson v. Leighton*, 168 F.3d 903, 909 (6th Cir. 1999). If the court finds no violation, then the case must be dismissed at this threshold stage because § 1983 is inapplicable on its face. *Katz*, 533 U.S. at 201; *see also* 42 U.S.C. § 1983 ("Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . *subjects, or causes to be subjected*, any citizen of the United States . . . *to the deprivation of any rights . . . secured by the Constitution . . .* shall be liable.") (emphasis added).

Thus, in the present case, which comes to the Court in the summary judgment posture, we must permit the case to go to a jury if, first, there are genuine issues of material fact as to whether Defendants violated St. John's Fourth Amendment rights in an objectively unreasonable way and, second, those rights were clearly established at the time of St. John's arrest such that a reasonable officer would have known that his conduct violated them. *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900-901 (6th Cir. 2004); *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003); *Burchett*, 310 F.3d at 942-43; *Risbridger v. Connelly*, 275 F.3d 565, 569 (6th Cir. 2002) (citing *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (*en banc*)).

**B.          Probable Cause**

          1.          The Violation of a Constitutional Right

          St. John contends the defendants lacked probable cause when they arrested him for disorderly conduct on November 9, 2000. The defendants had probable cause if at the moment they arrested St. John, "the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that [St. John] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964) (citations omitted).

          Defendants do not indicate in their brief precisely which section of the disorderly conduct statute they had probable cause to believe St. John had violated, but there are at least two sections arguably implicated by the facts. First, as articulated by the complaint Hickey filed six days after the arrest, the officers might have had probable cause to believe that "[o]n or about November 9, 2000 . . . St. John did recklessly cause inconvenience, annoyance, or alarm to another by: insulting, taunting, or challenging another, under circumstances in which that conduct is likely to provoke a violent response; in violation of [Ohio Revised Code § 2917.11(A)(3)]." (quoting statute). Second, the officers additionally or alternatively might have had probable cause to believe St. John recklessly caused inconvenience, annoyance, or alarm to another by "[c]reating a condition that is physically offensive to persons . . . by an act that serves no lawful and reasonable purpose of the offender." O.R.C. § 2917.11(A)(5). Under O.R.C. § 2935.26, an offender may be arrested for a violation of either section where the offender persists in the conduct after a reasonable warning or request to desist or engages in the conduct in the presence of "any law enforcement officer." O.R.C. § 2917.11(E)(3)(a) and (c).

          Both theories of probable cause involve material factual disputes. According to the allegation that St. John probably violated § 2917.11(A)(3), it appears that Defendants' theory when they arrested St. John was that his reckless, violence-inducing insults and taunts were directed at the McManuses and came in the form of the floodlights he had aimed at the McManus residence. Because of the particular factual context of this case – i.e, a long-running and vicious dispute between St. John and the McManuses, in which St. John's floodlights had already played a role – we have no reason to think these allegations are insufficient to make out a case of disorderly conduct under O.R.C. § 2917.11(A)(3). In any event, St. John does not give us any reason to believe the allegations are insufficient; for beyond the cursory statement that offensive floodlights are subject only to civil law, he offers no authority for the proposition that their use in the context of this case falls short of violating § 2917.11(A)(3).[1] As the plaintiff, St. John bears the burden of proving the absence of probable cause, *e.g.*, *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002), and he has not convinced us that probable cause was lacking as a matter of law.

          Nevertheless, fact questions preclude us from holding as a matter of law that the officers had probable cause to make the arrest; the most we can say is that the allegations of Hickey and his colleagues *might* amount to probable cause to arrest St. John for disorderly conduct. The critical fact questions are: whether St. John's lights were in fact targeted at the McManus residence (St. John maintains they were in the same non-offensive position Hickey had put them in earlier that summer,

---

          [1]We have found no Ohio case standing for the proposition that one's use of property always falls outside the ambit of § 2917.11(A)(3). And there is a case in which the Ohio Court of Appeals held that nonverbal conduct may be the basis for a prosecution under the section. *City of Columbus v. Hatfield*, 1994 WL 97116 (Ohio Ct. App. Mar. 22, 1994) (unpublished). In any event, St. John must show that Defendants' decision to arrest him was objectively unreasonable and in violation of clearly established law. In connection with St. John's assertion that the use of his floodlights did not constitute a crime for which he could be arrested, therefore, St. John would have to show that any reasonable Ohio police officer would have known in November 2000 that the use of floodlights could not be prosecuted under § 2917.11(A)(3). He does not make such a showing.

Boyer contends otherwise); and whether the lights did in fact cause inconvenience or annoyance inside the McManus residence (Hickey maintains he observed the effect of the lights inside the house but testimony from Mrs. McManus contradicts this, making Hickey's version subject to questions of credibility). A final question is whether, assuming there was probable cause to conclude the use of the floodlights met the other criteria for a violation of § 2917.11(A)(3), the officers had probable cause to believe their use under these circumstances was likely to provoke a violent response from any of the McManuses. In light of these fact questions, we cannot say the only reasonable determination is that the officers had probable cause to arrest; the question of probable cause must therefore be submitted to the jury. *Radvansky v. City of Olmstead Falls*, 395 F.3d 291, 302 (6th Cir. 2005); *Crockett v. Cumberland College*, 316 F.3d 571, 581 (6th Cir. 2003); *Fridley*, 291 F.3d at 872; *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001); *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995).

The same is true with respect to the second possible theory of probable cause, namely, that St. John had probably violated § 2917.11(A)(5) by creating a condition – intense light emanating from the floodlights – that was physically offensive to the McManuses and served no lawful purpose.[2] The critical questions here are whether Defendants had probable cause to believe the lights were in fact physically offensive and annoying or alarming to the McManuses and in fact served no lawful purpose. On the first question, the factual disputes just discussed preclude us from holding that probable cause existed as a matter of law. On the second question, St. John maintains he installed the lights for his own protection and did not target them at the McManus residence. There is more than one reasonable determination on these facts, so the question must be left to the jury. *E.g.*, *Radvansky*, 395 F.3d at 302.

###### 2.      The Right was Clearly Established

It is clearly established that officers must have probable cause to make an arrest. *E.g.*, *Radvansky*, 395 F.3d at 310; *Klein*, 275 F.3d at 550; *Donovan,* 105 F.3d at 298. Here, the question is whether the officers' allegations are true; if they are, then probable cause arguably existed and the officers are entitled to qualified immunity. But if the allegations are not true, the officers had no basis for concluding St. John had committed disorderly conduct. An arrest under these circumstances would have been objectively unreasonable and in violation of a clearly established Fourth Amendment right. Consequently, this claim must survive summary judgment. *See*, *e.g.*, *Radvansky*, 395 F.3d at 310; *Crockett*, 316 F.3d at 581.

#### C.      **Excessive Force**

###### 1.      The Violation of a Constitutional Right

The Fourth Amendment to the Constitution guarantees that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall be violated . . . ." U.S. Const. amend IV. Under the Fourth Amendment, "the 'reasonableness' of a particular seizure

---

[2]There is also a third possible theory of probable cause. The officers might have had probable cause to believe St. John's belligerent conduct towards *them* constituted disorderly conduct under section 2917.11(A)(3). The basis for an arrest under this theory would not be the floodlights but instead St. John's allegedly uncooperative, indeed belligerent, conduct in the face of the officers' repeated requests that he turn off the lights. This theory is the weakest one for Defendants because it requires proof that a reasonable police officer would have been likely to violently retaliate against St. John. Under the case law in Ohio, it is very difficult to furnish such proof because "the standard of what constitutes fighting words is raised in those cases where police officers are the offended party." *State v. Wood*, 679 N.E.2d 735, 739 (Ohio Ct. App. 1996); *see also State v. Wilson*, 656 N.E.2d 954, 956 (Ohio Ct. App. 1995) (no likelihood of the officer responding violently even where the offender was cursing at him and threatening him). Given this state of the law and the fact that St. John, however obnoxious he may have been, was confined to a wheelchair and posed no physical threat to Defendants, it is understandable why they have not pursued this theory of probable cause.

depends not only on *when* it is made, but also on *how* it is carried out." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (citing *Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985)). Thus there is a cause of action under 42 U.S.C. § 1983 for excessive force used to effectuate an arrest. *See id.*; *see also Kostrzewa v. City of Troy*, 247 F.3d 633, 638-39 (6th Cir. 2001). But as the text of the Fourth Amendment and the Supreme Court's cases indicate, an arrest need not be an assault for it to be actionable under § 1983. *See Burchett*, 310 F.3d at 946 (observing that an allegation of assault is not necessary to sustain an excessive force claim) (citing *Cornwell v. Dahlberg*, 963 F.2d 912, 915 (6th Cir. 1992)). The touchstone, as with all Fourth Amendment questions, is the reasonableness of the arresting officers' actions. As the Supreme Court put it in *Graham*, "[a]s in other Fourth Amendment contexts . . . the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397.

In *Graham*, the Supreme Court instructed reviewing courts to consider various factors in evaluating excessive force and unreasonable arrest claims. Accordingly, the "proper application" of the reasonableness inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396 (citing *Garner*, 471 U.S. at 8-9). These factors do not constitute an exhaustive list; the ultimate question is "whether the totality of the circumstances justifies a particular sort of seizure." *Id.* Resolving this question in a particular case inherently requires the court to carefully balance the nature of the intrusion on the arrestee's Fourth Amendment rights against "the countervailing governmental interests at stake." *Garner*, 471 U.S. at 8. Finally, as this Court has observed, "[t]his standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett*, 310 F.3d at 944.

Applying these principles to the circumstances of this case, we conclude there are genuine issues of material fact regarding whether Sheriff Hickey and his colleagues, Corporal Boyer and Officer Wolfe, acted reasonably when they attempted to place St. John in the cruiser even though he complained that his legs would not bend. Even assuming Defendants had probable cause to arrest St. John for disorderly conduct, St. John was not engaging in violent behavior; nor does it appear from the record that he was physically resisting the officers' attempts to remove him from the house. (Hickey testified that, at most, St. John was passively resisting arrest by sitting prone.) Even if there was evidence of resistance, it would be improper to determine whether the resistance justified the officers' actions because such a determination is for a jury in the first instance. In addition, St. John's crime was neither violent nor severe and Defendants do not contend that he presented a risk to anyone's safety. That St. John was cursing and yelling is relevant to whether the officers' actions were reasonable but surely not determinative of the issue. Finally, St. John clearly presented no risk of flight whatsoever. Thus, under the totality of the circumstances only a minimum of force was required to effectuate St. John's arrest. *See Graham*, 490 U.S. at 396; *see also Burchett*, 310 F.3d at 946 ("We have long recognized, for instance, that the Fourth Amendment permits detention using only 'the least intrusive means reasonably available.'") (quoting *United States v. Sanders*, 719 F.2d 882, 887 (6th Cir. 1983)). Additionally, the record does not suggest that exigent circumstances demanded a very speedy arrest of St. John as might be the case where officers needed to proceed quickly to another location or to tend to an injured party. Moreover, there is no question that the arresting officers knew St. John had muscular dystrophy and was confined to a wheelchair. *See Graham*, 490 U.S. at 397-98 (instructing courts to consider the circumstances confronting the arresting officers). It is against this backdrop that we consider the officers' attempt to seat St. John in the back of the cruiser.

After Boyer and Wolfe carried St. John out of the house,[3] they wheeled him to a cruiser. At this point, it is undisputed that St. John explained to the officers that he would not be able to fit in the back seat due to his muscular dystrophy. Specifically, in his affidavit, St. John states: "I told the officers that I would not fit in the back seat. Because of my disability, my legs would not bend. They paid no attention. Moreover, Officer Wolfe said that he had bigger men transported in the back seat. So the two officers continued to push with force to have me and my legs inside the cruiser. As they pushed, moved, turned, and twisted me and my legs, maneuvering me partially into the back seat, my leg got caught between the police cruiser and its back door, causing injury." In addition, it is undisputed that after the officers ceased trying to situate St. John in the back seat, they attempted to return him to his wheelchair and dropped him twice in the process.

Defendants contend that their actions were reasonable because St. John did not assist in their attempts to place him into the back seat. Defendants further claim that it was reasonable to place St. John in the back seat because "they had transported men larger than [St. John] in the back of cruisers before." In addition, Defendants assert that they were aware that St. John had been transported in a police cruiser in the past and therefore it was reasonable for him to be transported in a cruiser on this occasion. Regarding the first contention, we note that the record offers no support for the conclusion that St. John actively resisted arrest or placement in the cruiser. The Fourth Amendment does not require St. John to assist in his own arrest but it may require deference to officers' election to use force when attempting to subdue and transport a violent or out-of-control suspect. Yet evidence of such circumstances is lacking here.

Defendants' second contention is plainly not responsive to St. John's objection to being placed in the back seat. St. John informed the officers that he could not fit because his legs would not bend in light of his disability. The officers responded that they had successfully transported "bigger men" in the back of police cruisers. Indeed, Wolfe testified at his deposition that because of prior experiences with bigger men in the back seat, "I knew it was not physically impossible to get him in the back of the cruiser." Viewing the facts in the light most favorable to St. John, we cannot hold that the officers' response was reasonable as a matter of law. St. John did not say he was too *big* to fit, but rather that his disability rendered it impossible to sit in the manner required to fit in the back seat. As for the officers' third contention – that they were aware St. John had previously been transported in a cruiser – this, too, is not necessarily a reasonable basis for putting St. John in the *back* seat of the cruiser. St. John stated in his affidavit that after his arrest in June 2000, "Corporal Boyer transported me from the Nobel County Jail. On that occasion, Corporal Boyer transported me in his police cruiser in the *front* seat with oxygen equipment on hand that I used at the time. And there was no problem." It is not clear from the record whether the officers were relying on their memory of this occasion for their claim that it was reasonable to place St. John in the back seat. In any event, on these facts there is a colorable claim that the officers' decision to place St. John in the back seat was unreasonable.

In sum, viewing the facts in the light most favorable to St. John, we conclude that a reasonable jury could find in his favor on the claim that Defendants used excessive force in attempting to place him into the back seat. St. John informed the officers that his legs would not fit and they knew he was disabled and wheelchair-bound.[4] Indeed, Wolfe acknowledged at his deposition that St. John's legs would not bend; Wolfe further acknowledged that this may have been due to St. John's inability to bend them. Wolfe also testified that the officers attempted to push St.

---

[3] As they removed St. John from the house, it is undisputed that Boyer and Wolfe dropped St. John, who was in his wheelchair, to the ground. St. John does not contend this amounted to excessive force, however, conceding instead that it was mere negligence.

[4] Defendants do not dispute that St. John informed them that his legs would not bend in the manner required to fit in the back seat.

John such that he was facing forward and his legs fit in the car.  Boyer testified that he expected St. John to assist the officers  but instead St. John did "nothing."  Whether Boyer's assumption that St. John would assist was reasonable under the circumstances (Boyer testified that he knew that St. John drove a car and thus assumed he could enter and exit) is for the jury alone to determine because we cannot say the assumption was reasonable as a matter of law.

2.       The Right was Clearly Established

Viewing the facts in the light most favorable to St. John, Defendants' conduct was objectively unreasonable.  We now consider whether this alleged conduct resulted in a violation of a clearly established constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201-202 (2001).  In *Saucier*, the Supreme Court explained:

> [T]here is no doubt that *Graham v. Connor* [ ] clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness.  Yet that is not enough.  Rather, we emphasized in *Anderson* "that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant sense:  The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." [*Anderson v. Creighton*, 483 U.S. 635, 640 (1987)].

*Saucier*, 533 U.S. at 202.  Accordingly, the Court held that "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Id.*   Thus, "[i]f the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate."  *Id.*

Novel factual circumstances, however, do not automatically require a finding of qualified immunity.  *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *Champion v. Outlook Nashville, Inc.,* 380 F.3d 893, 902 (6th Cir. 2004).  The critical question is whether the case law has put the officer on notice that his conduct is clearly unlawful.  To resolve this question, this Court "must look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits."  *Higgason v. Stephens*, 288 F.3d 868, 876 (6th Cir. 2002).  The Court can consider more than merely the factual context of a prior case: "the general reasoning that a court employs" also may suffice for purposes of putting the defendant on notice that his conduct is clearly unconstitutional.  *Feathers*, 319 F.3d at 848.

Applying these principles to the present case, we conclude the right of a nonviolent arrestee to be free from unnecessary pain knowingly inflicted during an arrest was clearly established as of November 9, 2000, the day the defendants arrested St. John.  Consequently, the defendants are not entitled to qualified immunity on St. John's claim that they violated his Fourth Amendment rights by attempting to place him in the back seat of the police cruiser after he specifically explained that his legs would not bend on account of his muscular dystrophy.  Under these circumstances, a reasonable officer would have known that the manner of the arrest was clearly unlawful.  *See Saucier*, 533 U.S. at 202.

First, as the Court observed in *Saucier*, the *Graham* analysis regarding excessive force claims was clearly established at the time of St. John's arrest.  Thus, Sheriff Hickey and his colleagues were on notice that the legality of an arrest depends not only on when it is effectuated but also on how it is effectuated.  *See Graham*, 490 U.S. at 393-96.  In addition, the officers were aware that the *Graham* factors are applied by courts to determine the reasonableness of arresting officers' conduct in a given case.  Accordingly, the officers were aware that the Fourth Amendment required them to

take into account the risk of violence or flight posed by St. John, the seriousness of the crime they suspected him of committing, and whether he was actively resisting arrest. *Graham*, 490 U.S. at 396. In this circuit, furthermore, police officers would have been aware as of 1983 that a Fourth Amendment seizure must be effectuated with "the least intrusive means reasonably available." *United States v. Sanders*, 719 F.2d 882, 887 (6th Cir. 1983). Finally, the officers would have been aware of the general guideline that the Fourth Amendment always requires a balancing of a citizen's privacy interests and the state's interest in preventing or solving crime. *Graham*, 490 U.S. at 396. These generalized Fourth Amendment principles would lead a reasonable officer in 2000 to conclude that (1) St. John did not commit a severe crime and posed no imminent risk of active physical resistance, violence, or flight; (2) no exigent circumstances required the officers to immediately place St. John in the cruiser; and (3) in light of the first two conclusions, the state's interest in immediately carrying out the arrest was relatively minimal.

In a more specific sense, a reasonable officer in 2000 would have known that excessive force does not require an allegation of assault and that the conditions under which officers detain a person are relevant for purposes of the Fourth Amendment. *Cornwell v. Dahlberg*, 963 F.3d 912, 915 (6th Cir. 1992) (recognizing that detaining someone face down on cold and muddy ground may constitute excessive force). Further, a reasonable officer would have known that the unnecessary infliction of pain on an arrestee constitutes a Fourth Amendment violation. *Martin v. Heideman*, 106 F.3d 1308, 1312-13 (6th Cir. 1997); *Walton v. City of Southfield*, 995 F.2d 1331, 1342 (6th Cir. 1993) (both holding that an excessive force claim may be based on officers' handcuffing an arrestee unnecessarily tightly). Viewing the facts in the light most favorable to St. John, a reasonable jury could conclude that, having heard the protestations of an obviously disabled and wheelchair-bound man that his legs could not bend, the officers nevertheless pushed St. John into the back seat of the cruiser and attempted to bend his legs, causing him pain that was clearly unnecessary in light of the limited government interest at stake at that particular moment. Because a reasonable officer would have known as of November 9, 2000, that this conduct was clearly unlawful, the defendants are not entitled to qualified immunity to the extent they attempted to place St. John in the back seat of the cruiser after he explained the limitations of his legs.

## D.    Official Capacity Claim

St. John additionally contends that Sheriff Hickey must be held liable in his official capacity for failure to adequately train his deputies – and presumably himself – in the arrest and transportation of disabled and/or wheelchair-bound persons. In our view, the district court properly granted summary judgment to Defendants in their official capacities because St. John has not come forward with sufficient evidence that Vinton County was deliberately indifferent to citizens' Fourth Amendment rights.

The Supreme Court has held that "[o]fficial capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. Dep't of Soc. Serv. of City of New York*, 436 U.S. 658, 691 (1978). And as this Court very recently observed, where a § 1983 plaintiff claims that a sheriff's department failed to train its officers, he "must prove that [the sheriff's department] was deliberately indifferent to the rights of citizens who came into contact with deputies." *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005) (citing *Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir. 1997)); *see also Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 407-408 (1997). To establish deliberate indifference, the plaintiff "must show prior instances of unconstitutional conduct demonstrating that the County has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Fisher*, 398 F.3d at 849 (citing, *inter alia*, *City of Canton v. Harris*, 489 U.S. 378 (1989)). Such a showing is critical to a successful §1983 claim against a municipal actor in his official capacity because mere vicarious fault for employees' torts is not actionable. *Brown*, 520 U.S. at 403; *City of Canton*, 489 U.S. at 392.

St. John presents no evidence tending to show that Sheriff Hickey and the Vinton County Sheriff's Department "ignored a history of abuse and [were] clearly on notice that the training in this particular area was deficient and likely to cause injury." *Fisher*, 398 F.3d at 849. While St. John can point to evidence in the record tending to show that Sheriff Hickey did not provide specific training on the issue of detaining and transporting disabled and/or wheelchair-bound persons,[5] this in and of itself does not support the conclusion that the need for such training was obvious in order to prevent violations of citizens' constitutional rights. St. John does not argue that the Sheriff failed to provide training on the core constitutional obligations of arresting officers, such as the requirement that an arrest be supported by probable cause and that it be carried out in a reasonable manner under the circumstances. A complete lack of training on concepts so fundamental as these may enable a plaintiff to survive summary judgment "without showing a pattern of constitutional violations." *Brown*, 520 U.S. at 409. But such a case is very rare; indeed, the plaintiff must show that a violation of constitutional rights is "a *highly predictable* consequence of a failure to equip law enforcement officers with specific tools to handle *recurring* situations." *Id.* (emphases added). Although it is reasonable, as St. John contends, to assume that arresting officers in Vinton County will encounter disabled and/or wheelchair-bound persons, this assumption alone does not support the conclusion required for § 1983 liability to attach – i.e., that officers' general training on the manner of effectuating an arrest and using "common sense" is so insufficient that a "highly predictable consequence" will be recurring violations of the rights of disabled and/or wheelchair-bound persons. *Brown*, *supra*, at 409.

Because St. John did not produce evidence that Sheriff Hickey ignored a pattern of constitutional violations, nor that the failure to train on the specific issue of arresting and transporting wheelchair-bound persons was highly likely to result in widespread violations of constitutional rights, this Court must affirm the district court's grant of summary judgment to Defendants in their official capacities. *See Brown*, 520 U.S. at 403, 407-409; *Fisher*, 398 F.3d at 849; *Stemler*, 126 F.3d at 865.

## IV. CONCLUSION

We AFFIRM the judgment of the district court to the extent it relates to claims against Defendants in their official capacities but REVERSE the judgment to the extent it relates to claims against them in their individual capacities. The case is remanded for proceedings consistent with this opinion.

---

[5] Hickey testified that "[w]e have not had any formal training in this area. Basically, what we do is just good common sense . . . ." Boyer testified that he could not recall whether the sheriff's department or the police academy had provided training on arresting disabled individuals. Wolfe, however, testified that the police academy provided 6 hours of training on the issue of dealing with mentally and physically handicapped persons.