**NOT RECOMMENDED FOR PUBLICATION**
File Name: 18a0172n.06

**No. 17-5622**

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| SUZAN EVANS, Individually, and as Wife and Next of kin of SCOTT EVANS, deceased, | ) ) ) | **FILED** Apr 03, 2018 DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE |
| UNITED STATES OF AMERICA; FEDERAL BUREAU OF INVESTIGATION, | ) ) ) | |
| Defendants-Appellees. | ) ) | |

BEFORE: MERRITT and SUTTON, Circuit Judges; CLELAND, District Judge.[*]

CLELAND, District Judge. FBI agents and other officers approached Scott Evans's home early in the morning of March 6, 2013. They had a warrant for his arrest charging receipt and distribution of child pornography, and a search warrant for his residence focused on locating further evidence of those crimes.

When the agents forced an entry into the residence, Evans emerged from the bathroom, entered the bedroom, and before agents could do much more than watch, he retrieved a holstered .357 magnum revolver. Agents uniformly aver that they yelled at Evans, loudly and repeatedly demanding that he drop the gun; Plaintiff, Evans's wife, just outside the bedroom, disputes those claims, and says she heard no demands, no yelling, no words of any kind. No one disputes, however, while Evans held the gun to his head—and in so doing pointed it in the same direction

---

[*] The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

as one or more agents—he began to withdraw it from the holster. Upon seeing that action, one of the agents fired three quick shots. Evans died at the scene.

Plaintiff argues that the agents' actions were objectively unreasonable under the circumstances and that she is therefore entitled to relief under Tennessee law, Tenn. Code Ann. § 20-5-106(a), as authorized by the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671–80. The district court disagreed, and entered summary judgment in defendant United States'[1] favor. For the reasons that follow, we affirm.

I.

During a wide ranging investigation, FBI agents learned that Scott Evans had sent and received numerous emails containing images and videos depicting child pornography. (R. 21-1, ID 95–96). On the basis of these emails, the United States Attorney's office filed a criminal complaint alleging distribution and receipt of child pornography, 18 U.S.C. § 2252A(a)(2), against Evans, and applications for arrest and search warrants. (ID 90–96). A magistrate judge signed warrants, to be executed at the Evans' home in New Market, Tennessee. (ID 96–98).

Two days later, FBI Special Agent Bianca Pearson led a team of agents to execute the warrants at Evans's residence, which was a "double wide" manufactured home. (R. 24, ID 176). Evans lived there with his wife and their two daughters; his relatives lived in neighboring homes, and Evans held a concealed carry permit. (ID 175–76). Given these facts, Pearson determined

---

[1] Because "a federal agency cannot be sued under the FTCA," *Chomic v. United States*, 377 F.3d 607, 608 (6th Cir. 2004), the district court properly dismissed the Federal Bureau of Investigation as a defendant in this case. That ruling is not challenged on appeal.

multiple agents would be required to secure the location, and briefed all agents on the FBI deadly force policy. (ID 175). The parties dispute some aspects of the FBI's search that followed.[2]

According to defendants' account, Special Agent Casey Helm shouted something to the effect of, "FBI, search warrant come to the door!," as he knocked on Evans's front door. (R. 24, ID 176; R. 25, ID 182; R. 28, ID 201). After waiting "a reasonable amount of time" with no response to the knock and announce, Special Agent Jeffrey Blanton used a "breaching tool" (battering ram) to force open the door. (R. 24, ID 176; R. 28, ID 201). The door did not open fully, and Helm later determined that plaintiff was in the door's path during the breach. (R. 25, ID 182). Special Agent Gregory Smith pushed the door fully open, and ordered plaintiff to get down on the floor. (*Id.*; R. 27, ID 195; R. 31, ID 219). Helm and Special Agents Lane Rushing and Paul Scown followed closely thereafter. (R. 25, ID 182; R. 27, ID 195; R. 31, ID 219).

Smith and Helm cleared the side rooms of the home, encountering plaintiff's and Evans's two daughters, before returning to the room at the main entrance. (R. 25, ID 182; R. 27, ID 196). Special Agent Letitia Jones attended to plaintiff and the two daughters in the main room. (R. 30, ID 213). She averred that there was a television on in the main room, but despite the fact that "it was noisy in the trailer, the bedroom was not far away, and [agents'] shouts were loud enough to

---

[2] The various factual accounts are provided by competing affidavits of the agents, plaintiff, and plaintiff's daughters. Depositions of the agents or a review of the agents' field reports may have held some evidentiary value in this case as the only living witnesses to the final, critical events were defendant agents, but no discovery was conducted and the motion for summary judgment was decided on the strength of sworn affidavits. Plaintiff filed a motion for discovery pursuant to Federal Rule of Civil Procedure 56(d), but plaintiff's counsel failed to specify in the supporting 56(d) affidavit what discovery was needed or how discovery would "enable [plaintiff] to rebut the movant's showing of the absence of a genuine issue of fact." *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 623 (6th Cir. 2014) (quoting *Willmar Poultry Co. v. Morton-Norwich Prods., Inc.*, 520 F.2d 289, 297 (6th Cir. 1975)). Consequently, the district court denied the motion. (*See* R. 39-11; R. 54, ID 383).

be heard distinctly." (R. 30, ID 213). Several agents attested that the scene in the house was very noisy in general. (*See* R. 30, ID 213; R. 31-1; R. 31-2; R. 31-3).

Scown and Rushing headed toward the master bedroom in the back of the home and, upon reaching the doorway to the bedroom, Rushing saw Evans, naked and armed with a revolver, move quickly from the adjoining bathroom to the master bedroom. (R. 29, ID 207; R. 31, ID 220). Rushing attested he began to "repeatedly issue commands," shouting "FBI! FBI!", "Get your hands up!", and "Drop the gun!" (R. 29, ID 207; R. 31, ID 219). Other agents who were in the bedroom or in neighboring rooms confirmed that an agent repeatedly directed Evans to drop his weapon. (R. 26, ID 188; R. 30, ID 213; R. 31, ID 219).

In his right hand Evans held the gun, which was in a dark-colored holster and pointed at his own head. (R. 29, ID 207; R. 31, ID 220). Rushing entered the room, took cover by a corner of the bed, and determined that Evans's gun, being holstered, prevented Evans from accessing the trigger. (R. 29, ID 207). Scown also entered the room and noticed that the holster blocked Evans's access to the trigger. (R. 31, ID 220). Once Scown and Rushing were at the foot of the bed, Evans slid backwards off the bed and onto the floor, near the open door to the adjoining bathroom. (*Id.*; R. 29, ID 207). Special Agents David Bishop, Helm, and Smith then all entered the bedroom. (R. 25, ID 182; R. 26, ID 188; R. 27, ID 196).

While kneeling on the floor, Scown saw a "glint of metal"; Evans had removed the holster from the gun with his left hand. (R. 31, ID 221). Scown fired his weapon, striking Evans three times. (*Id.*). Evans then fell forward, slumped on top of his arms and legs. (*Id.*). As Scown walked around the bed to inspect Evans, he observed that Evans was holding the revolver, completely unholstered, in his right hand. (*Id.*). Bishop removed the silver handgun from Evans's hand and proceeded to handcuff him. (R. 26, ID 189). Blanton entered the room

as Bishop was handcuffing Evans and observed "what appeared to be a cocked, silver .357 revolver tucked under Evans'[s] right side." (R. 28, ID 202). Evans died soon thereafter. (R. 31, ID 221).

Plaintiff disputes parts of this narrative. She averred that she heard a loud banging on the front door, but no accompanying yelling or announcement. (R. 39-1, ID 255). She immediately ran to the door and looked into the peephole, through which she saw individuals in all black clothing with no identifying markings standing outside the door. (*Id.*). Before she could open the door, these individuals smashed it in, breaking her nose and knocking her back about five feet. (*Id.*). Plaintiff attested that an agent grabbed her, "threw" her facedown on the ground, and handcuffed her, without showing her a warrant or even identifying the individuals as FBI agents. (ID 255–56). While handcuffed, plaintiff heard no "shouting, talking, commands, or anything like that coming from the bedroom," despite the fact that she was "so close to the bedroom" that she "definitely would have heard" such communications. (ID 256). Then she heard two gunshots ring out from the bedroom, after which an agent exited the bedroom and yelled for someone to call an ambulance. (*Id.*). Plaintiff's two daughters attested to a similar version of events. (R. 39-2, ID 257–58; R. 39-3, ID 259–60). Neither plaintiff nor her daughters claimed that they were in the bedroom or near enough to its entrance to observe the agents' encounter with Evans.

Following these events, plaintiff filed an administrative claim with the Department of Justice, which the Department denied by letter on April 16, 2015. (R. 21-5, ID 114). Having exhausted her administrative remedies as required by the FTCA prior to filing suit, 28 U.S.C. § 2675(a), plaintiff filed a complaint on behalf of her husband in the district court, alleging claims under Tennessee's wrongful death statute, Tenn. Code Ann. § 20-5-106 (2011), in

accordance with the FTCA. (R. 1-1). The district court granted summary judgment in defendants' favor, holding the totality of the circumstances at the moment Scown shot Evans justified the use of deadly force. (R. 54, ID 371–85). The court reasoned Evans was soon to be arrested for a severe crime (child pornography), was actively resisting arrest at the time he was shot, and posed an imminent threat of serious physical harm to the agents. (ID 379–80). The court also held that, even accepting the account in plaintiff's affidavit—claiming that no agents commanded Evans to drop the gun or otherwise warned him before shooting him—this absence of commands was not sufficient to create a genuine dispute of material fact or render the agents' conduct unlawful. (ID 380–81).

Plaintiff now appeals.

## II.

We review a trial court's grant of summary judgment de novo. *Sumpter v. Wayne Cty.*, 868 F.3d 473, 480 (6th Cir. 2017). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "To prevail, the nonmovant must show sufficient evidence to create a genuine issue of material fact, which is to say, there must be evidence on which the jury could reasonably find for the nonmovant." *Sumpter*, 868 F.3d at 480 (internal quotation marks and brackets omitted). All evidence and inferences therefrom must be viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## III.

Pursuant to the Eleventh Amendment of the United States Constitution, the federal and state governments are immune from liability; however, the government may waive its immunity and consent to suit in federal court. U.S. Const. Amend. XI; *see Green v. Mansour*, 474 U.S. 64,

68 (1985). Congress waived the federal government's sovereign immunity through enactment of the FTCA, which provides subject matter jurisdiction "for plaintiffs to pursue state law tort claims against the United States." *Milligan v. United States*, 670 F.3d 686, 692 (6th Cir. 2012) (citing 28 U.S.C. § 1346(b)(1)). The FTCA "is the exclusive remedy for suits against the United States or its agencies sounding in tort." *Himes v. United States*, 645 F.3d 771, 776 (6th Cir. 2011) (citing 28 U.S.C. § 2679(a)). Under the statute, the United States waives its sovereign immunity and consents to liability

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C.A. § 1346 (b)(1). Thus, the United States is liable for the payment of money damages to the extent afforded by the law of the place—here, Tennessee—where the alleged tortious act or omission occurred. *See Himes*, 645 F.3d at 776–77.

Tennessee provides a cause of action to the surviving spouse of any "person who dies from injuries received from another, or whose death is caused by the wrongful act, omission, or killing by another." Tenn. Code Ann. § 20-5-106(a) (2011). The Tennessee Supreme Court has interpreted this cause of action to encompass acts of negligence resulting in death. *See Spires v. Simpson*, No. E201500697SCR11CV, 2017 WL 6602434, at *4 (Tenn. Dec. 27, 2017) (stating that a person's right of action for negligence "does not abate upon his death," but instead passes to the surviving spouse under Tennessee's wrongful death statute). A negligence claim requires evidence establishing "(1) a duty of care owed by the defendant to the plaintiff, (2) conduct falling below the applicable standard of care that amounts to a breach of that duty, (3) an injury or loss, (4) cause in fact, and (5) proximate cause." *Haynes v. Wayne Cty.*, No.

M201601252COAR3CV, 2017 WL 1421220, at *5 (Tenn. Ct. App. Apr. 19, 2017). The applicable standard of care is dependent upon the facts supporting the negligence claim. *See Atkinson v. State*, 337 S.W.3d 199, 205 (Tenn. Ct. App. 2010) (holding that a wrongful death claim based on a prison's failure to properly treat a suicidal prisoner required evidence of the standard of care owed to the prisoner under the circumstances).

According to Tennessee courts, when the alleged negligence is committed by a police officer "during a legitimate confrontation with an armed person . . . the normal definition of negligence" is altered. *Johnson v. Metro. Gov't of Nashville & Davidson Cty.*, No. M200800551COAR3CV, 2008 WL 5206303, at *5 (Tenn. Ct. App. Dec. 12, 2008).[3] In particular, the standard of care owed to the claimant under said circumstances is the "reasonableness" standard applicable to claims of excessive force brought pursuant to the Fourth Amendment of the United States Constitution. *Id.* at *6–8, (citing and quoting *Smith v. Freland*, 954 F.2d 343, 346–47 (6th Cir.1992) (holding that the officer's use of deadly force was reasonable and did not constitute excessive force in violation of the Fourth Amendment). As the Tennessee Court of Appeals explained, "Whether a police shooting case is brought as a 'civil rights' case or a negligence case, both come down to determining if the officer's actions were 'reasonable' under the circumstances." *Id.* at *9 n.6. Therefore, we turn to the Fourth Amendment.

The Fourth Amendment prohibits the government from conducting "unreasonable searches and seizures." U.S. Const. Amend. IV. The Supreme Court has held that

---

[3] *Johnson* addressed a negligence claim brought pursuant to the Tennessee Governmental Tort Liability Act, Tenn. Code Ann. § 29-20-101—the state equivalent to the FTCA in the sense that the Act waives the state and local government's sovereign immunity with respect to liability for negligent acts or omissions. *See* Tenn. Code Ann. § 29-20-205.

"apprehension by the use of deadly force is a seizure," *Tennessee v. Garner*, 471 U.S. 1, 7 (1985), "properly analyzed under the Fourth Amendment's objective reasonableness standard." *Scott v. Harris*, 550 U.S. 372, 381 (2007) (internal quotation marks and alterations omitted). Courts "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id.* at 383 (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)). This analysis is fluid and "not capable of precise definition or mechanical application," *Graham v. Connor*, 490 U.S. 386, 396 (1989) (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)), but amounts to a determination of whether the totality of the circumstances justifies the seizure, *Garner*, 471 U.S. at 8–9. The determination is an objective one, "considered from the perspective of a hypothetical reasonable officer in the defendant's position and with his knowledge at the time, but without regard to the actual defendant's subjective intent when taking his actions." *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017).

In particular, the Supreme Court has directed us to consider "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. This is not an exhaustive list, and the ultimate inquiry remains "whether the totality of the circumstances justifies a particular sort of seizure." *St. John v. Hickey*, 411 F.3d 762, 771 (6th Cir. 2005) (quoting *Graham*, 490 U.S. at 396). "It is the reasonableness of the 'seizure' that is the issue, not the reasonableness of the detectives' conduct in time segments leading up to the seizure." *Chappell v. City Of Cleveland*, 585 F.3d 901, 909 (6th Cir. 2009).

Ultimately, the *Graham* factors are intended to help determine whether "the officer ha[d] probable cause to believe that the suspect pose[d] a threat of serious physical harm, either to the

officer or to others." *Garner*, 471 U.S. at 11; *see also Foster v. Patrick*, 806 F.3d 883, 887 (6th Cir. 2015). If he did, then the use of deadly force was "not constitutionally unreasonable." *Garner*, 471 U.S. at 11. The touchstone of "probable cause" is a "reasonable ground" for the belief. *See Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008) (emphasis in original) (quoting *United States v. Romero*, 452 F.3d 610, 615–16 (6th Cir.2006)). Reasonableness is evaluated based on an "objective assessment of the danger a suspect poses *at that moment*." *Mullins v. Cyranek*, 805 F.3d 766, 769 (6th Cir. 2015) (quoting *Bouggess v. Mattingly*, 482 F.3d 886, 889 (6th Cir. 2007)).

In evaluating the use of deadly force in this case, therefore, we must determine whether "a hypothetical reasonable officer in [Scown]'s position and with his knowledge at the time," *Latits*, 878 F.3d at 547, would have had "probable cause to believe that [Evans] pose[d] a threat of serious physical harm, either to the officer or to others." *Garner*, 471 U.S. at 11.

Viewing the evidence in the light most favorable to plaintiff, and considering the totality of the circumstances, an objectively reasonable officer armed with Scown's knowledge and in his position would have had probable cause to believe that Evans posed a threat of serious physical harm to the officers.[4] Agents encountered Evans in an enclosed space holding a revolver to his head. (R. 29, ID 207; R. 31, ID 219). Rather than submit to the agents' show of

---

[4] Plaintiff claims that the facts are not only viewed in her favor, but are established in her favor because her unanswered requests for admission must be deemed admitted as a matter of law. (Pl. Br. at 5). However, plaintiff failed to raise this issue in her statement of the issues. (Pl. Br. at 1). Therefore, plaintiff failed to preserve this issue for appeal under the mandate of Federal Rule of Appellate Procedure 28(a)(5), and it is forfeited. *McCarthy v. Ameritech Publ'g, Inc.*, 763 F.3d 488, 494 (6th Cir. 2014). Moreover, plaintiff wholly fails to note that the district court actually addressed this issue below and decided against her. (R. 54, ID 384). She does not address, or even mention, the district court's ruling, nor does she explain how the court abused its discretion on that evidentiary issue. Having presented a skeletal argument, *United States v. Hendrickson*, 822 F.3d 812, 829 n.10 (6th Cir. 2016), we consider it abandoned. *See Vander Boegh v. EnergySolutions, Inc.*, 772 F.3d 1056, 1063 (6th Cir. 2014).

force, Evans reached with his other hand and began to remove the revolver from its holster. (R. 27, ID 197; R. 31, ID 221). Three agents, including Scown, saw a glint of light or silver indicating Evans had at least partially succeeded. (R. 31, ID 221; R. 29, ID 207; R. 27, ID 197). At this point, Scown "was afraid for [his] life and the lives of those around" him and shot Evans. (R. 31, ID 221). It bears mention that when agents recovered the gun from Evans's hand after he was shot, it was completely unholstered, loaded, and cocked, confirming the agents' impression that Evans was in the process of releasing the revolver from the holster just before the shots were fired. (R. 26, ID 189; R. 28, ID 202; R. 31, ID 221).

The agents avowed that they feared for their lives during the encounter and believed that "Evans either intended to take his own life or to threaten us with the gun." (R. 29, ID 208; R. 31, ID 221). "Because of the general angle at which Evans was holding the gun, even if his intention was to shoot himself, he still would have been firing in [the] direction" of an agent. (R. 27, ID 197). Additionally one agent considered that "a subject holding a gun to his head could very quickly point the gun at law enforcement officers and fire." (R. 29, ID 207). Scown and the other agents were objectively reasonable in their belief that Evans posed an imminent threat of serious physical harm to them. *St. John*, 411 F.3d at 771. Plaintiff has presented no genuine issue of material fact on this point that could prevent summary judgment. *Anderson*, 477 U.S. at 247–48.

Plaintiff argues that summary judgment is inappropriate where "virtually all of the essential facts" are disputed, *Jackson v. Hoylman*, 933 F.2d 401, 403 (6th Cir. 1991), and their resolution "turn[s] on credibility" *Bass v. Robinson*, 167 F.3d 1041, 1046 (6th Cir. 1999). As defendants correctly note, plaintiff can survive summary judgment only if she shows a genuine issue of *material* fact related to her claim. *Anderson*, 477 U.S. at 247–48. And the substantive

claim serves to identify which facts are material. *Id.* at 248. Contrary to plaintiff's argument, the district court was not confronted with conflicting *material* facts.

Plaintiff alleges that defendants acted negligently in shooting Evans. The conduct relevant to the substantive claim, then, is Scown's discharge of his firearm in the bedroom, and the moments immediately preceding, not what may have occurred in the adjoining room or at the front door. *See Mullins*, 805 F.3d at 769 (holding that the reasonableness of an officer's use of deadly force is based on "an objective assessment of the danger a suspect poses *at that moment*"); *accord Livermore v. Lubelan*, 476 F.3d 397, 406–407 (6th Cir. 2007). Defendants presented uncontroverted evidence as to the events in the bedroom immediately before the shooting. The affidavits of plaintiff and her two daughters are devoid of facts regarding what occurred in the bedroom when Scown shot Evans, except that none of them heard agents give any commands to Evans before the shooting. (R. 39-1, ID 255–56; R. 39-2, ID 257-58; R. 39-3, ID 259–60). As the district court recognized, this is not a material fact sufficient to withstand summary judgment. (R. 54, ID 381.) It does not affect the outcome of the court's critical inquiry—whether "a hypothetical reasonable officer in [Scown]'s position and with his knowledge at the time," *Latits*, 878 F.3d at 547, would have had "probable cause to believe that [Evans] pose[d] a threat of serious physical harm, either to the officer or to others." *Garner*, 471 U.S. at 11.

Even assuming the agents issued no verbal commands or warnings to Evans, the sudden and immediate nature of the serious threat remains the same. The moment Evans began to unholster the revolver, the agents were faced with a life-threatening situation. It was objectively reasonable for Scown to conclude at that moment that Evans presented a serious physical threat to the agents in the bedroom, given their close proximity and his erratic behavior. *Livermore*, 476

F.3d at 405; *see also Rucinski v. Cty. of Oakland*, 655 F. App'x 338, 342 (6th Cir. 2016) (holding officers were entitled to qualified immunity because their use of deadly force was objectively reasonable) (citing *Chappell v. City Of Cleveland*, 585 F.3d 901, 911 (6th Cir. 2009) (holding that the detectives' use of deadly force was reasonable as a matter of law where detectives shot and killed a suspect after he moved to within seven feet of them while holding a steak knife over his head)).

While plaintiff contends that Evans was "the victim of unreasonable police tactics and split-second decision-making on the part of the officers involved," (Pl. Br. at 7), it is exactly these kinds of "split second" decision-making pressures officers so often face (and faced here, in fact) that undermines her case. As the Supreme Court has long emphasized:

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Graham*, 490 U.S. at 396–97. In a small bedroom occupied by numerous agents, and presented with an armed individual behaving erratically, the "calculus of reasonableness" allows for the split-second determination made here. The district court correctly held that Scown's actions were objectively reasonable.

Because Scown's actions were reasonable, he is not negligent under Tennessee law. As discussed, the Fourth Amendment reasonableness assessment supplants the negligence inquiry in cases concerning law enforcement's use of deadly force under Tennessee tort law, Tenn. Code Ann. § 20-5-106(a). *See Johnson*, No. M200800551COAR3CV, 2008 WL 5206303, at *9 n.9 (Tenn. Ct. App. Dec. 12, 2008) ("Whether a police shooting case is brought as a 'civil rights'

case or a negligence case, both come down to determining if the officer's actions were 'reasonable' under the circumstances.").  The district court was proper in holding that defendants are entitled to summary judgment on plaintiff's negligence claim brought pursuant to the FTCA.

## IV.

The judgment of the district court is AFFIRMED.

**MERRITT, Circuit Judge, dissenting.** The Seventh Amendment requires that "the right to a trial by jury shall be preserved . . . according to the rules of the common law." In other similar police shooting cases of this type in which there are disputes of fact, the court has insisted upon a jury trial. *Withers v. City of Cleveland*, 640 F. App'x 416 (6th Cir. 2016).

There is a dispute of fact here. First, plaintiff alleges that she only heard a loud banging on the front door of her mobile home. She did not hear any accompanying announcement. When she ran to the door and peered into the peephole, she saw individuals dressed in black and devoid of identifying markings. Those individuals kicked the door in with such force that they broke her nose and knocked her backwards. Then, an agent threw her facedown on the ground in the main room and handcuffed her. She attests that the agents still did not identify themselves at this point or provide her with a warrant. Second, plaintiff remained handcuffed close to the bedroom, but heard no talking, yelling, warnings, or commands coming from the bedroom. She asserts that she would have heard any such communications due to her proximity to the bedroom. However, she only heard two gunshots. Plaintiff's two daughters, also present with her in the main room, corroborate her version of events. These alleged facts are pertinent and indicate an attitude and pattern of behavior on the agents' behalf that a jury may find extreme and unwarranted. The dispute of fact may convince the jury that the officers' alleged violent behavior caused the decedent to try to protect himself with a pistol in self-defense before he was killed. We have a long-standing tradition of trial by jury in these kind of cases. We should continue to honor that tradition.