Eugene **LAWSON**, Individually, et al.,
Appellants,

v.

John **BURNETT**, Appellee.

Court of Appeals of Kentucky.

Oct. 15, 1971.

Boyd F. Taylor, Hamm, Taylor, Milby & Farmer, London, for appellants.

G. G. Teague, Jr., J. B. Johnson, Jr., and William Cox, Jr., Johnson, Teague & Cox, Williamsburg, for appellee.

STEINFELD, Judge.

Appellant, Eugene Lawson, individually and as administrator of the estate of his wife, sought damages from John Burnett, Ulys Lawson and Charlie Louis Lawson for the wrongful death of his wife under KRS 411.130 and for personal injuries to himself. That statute authorizes the personal representative of one whose death " * * * results from an injury inflicted by the negligence or wrongful act of another * * *" to recover damages. It provides how the proceeds of the recovery shall go.

Lawson alleged that Burnett was sheriff of Whitley County, Kentucky, and Ulys Lawson and Charlie Louis Lawson were deputy sheriffs employed by Burnett and acting within the scope of such employ-

ment when Eugene was shot and injured and his wife was shot and killed. He claims that greater force was used than necessary in executing a warrant for his arrest. Appellant will be referred to as Eugene and the others also will be referred to by their first names of John, Ulys (sometimes spelled Eulis) and Charlie. Mrs. Eugene Lawson, deceased, will be called Nancy.

John moved for summary judgment, which motion was sustained. A judgment was entered accordingly and was made final as to John under Cr. 54.02(1), but the action was continued generally as to the other two defendants. Eugene's testimony, given in a criminal proceeding, was considered by the court in support of the motion. He had stated that he and his wife were in Tennessee, just over the Kentucky border, when he saw Ulys and Charlie nearby. He and Nancy got into their truck and Nancy drove. Eugene testified that he recognized Ulys and Charlie and knew they were deputy sheriffs; that at some prior time Ulys had threatened him; that after he had observed these two men sitting in their automobile his "six sense" told him they could be waiting on him, so as they drove along he got out his shotgun and loaded it with five shells filled with double ought buckshot; that when his car had passed the place where the deputies' car had been parked he noticed them behind him signalling with their lights; that he told his wife that the law was behind them and for her to pull over and stop, which she did; that the deputies' car stopped too; that Ulys and Charlie got out of their vehicles; that after he observed that Ulys and Charlie were armed he reached back into his car and armed himself with his loaded shotgun and confronted the deputies with it.

In his own words, Eugene then stated: "I said, 'Eulis, I don't want to have no trouble with you. Would you please get back in the car.' * * * I said, 'Charlie, what's this all about?' He said, 'I have a warrant for you.' * * * I said, 'What kind of warrant have you got?' He said, 'I've got a peace warrant for you.' I said, 'Let me read it.' He held the flashlight for me to read it. It was dark but the gas pumps were on. There was quite a bit of light there. I read the peace warrant and I said, 'Charlie, I won't go with Eulis to jail.' I said, 'If you'll call the sheriff up here, I'll go with the sheriff, or call the state police, I'll go with the state police.' I begged him to call the sheriff or the state police either one. Neither one wouldn't call. Eulis said, 'No, we're not calling no one.' Well, I said, 'Charlie, will you take me to jail?' I said, 'I'll go with you.' He said 'Yes'. I said, 'Will you take me to jail in my truck?' I said, 'Yes, let Nancy drive it or you can drive it,' and he agreed to take me to jail." Eugene continued: "Well, we were walking toward the truck and Charlie had a shotgun laying along like this in his arms. We were walking toward the truck and Eulis ran around Charlie on the opposite side from me and we were getting right at the truck door by this time, standing right at the truck door, and I heard Eulis say, 'Hell, no, you're not going to jail in your own truck.' At that time I had hold of Charlie's arm, at that time, when we were fixing to get in the truck. He reached up and I remember having my hand on the door and I heard a shot; that's all I heard now. Either he reached around Charlie, or he reached over him, I don't know which, because I am blind in my left eye. He reached over him or around him, one. I heard that one shot; that's all I heard. I don't know how I got over the bank but I was standing about as close to the embankment as far as this lady here. I don't know how I got over the bank. All I heard was this shot. When I came to under the embankment, Charlie Lawson had me sitting up. My leg was in such a shape I thought I was dying. I thought I was just dying—the pain in my leg. The bullet had struck me right here and came out my spine. * * * Q48. 'Now, tell what happened.' A. 'When I came to, Charlie had me sitting up and I was in a daze. I looked up and Eulis was standing right over me, snapping his pistol,

right down like that.' Q49. 'How did he have the pistol pointed, if he did have it pointed.' A. 'Pointed right at my face. I said, Lord have mercy, don't shoot me no more.' Q50. 'What?' A. 'I said, Lord have mercy, don't shoot me no more, and I passed back out. When I came back to again, I heard a shot. I looked up and Eulis was standing right on top of the bank and had the gun pointed directly at the truck's right window, looking right toward my wife. I mean the way the truck was setting. I don't know what kind of shot. I just heard a shot and saw him standing there. I kindly went blank again and when I came back to again, Charlie said something. He said, 'Lord have mercy, is he going to come back and kill you and me both?' I said, 'I don't know, Charlie, don't leave me, don't leave me.' I heard Eulis trying to work the magazine, or working it, or something.' Q. 'On what?' A. 'On the shotgun. I don't know what he did to the · shotgun but anyhow he walked over and put the shotgun in the back seat. He walked over and the best I could see he emptied, looked like, all the shells, and they were emptied out in the sheriff's patrol car, in the front seat. During this time they had got me up over the bank, George Morning and Charlie Lawson. I begged Charlie Lawson—Nancy had been shot and I begged Charlie to get me up. I said, 'Charlie, he's killed her,' and I said, 'Get me up there.' He said, 'No, I don't know.' He said 'I don't know.' I said, 'Get me up to the truck,' and she got out· about the time we got up on top of the embankment. She got out of the truck and fell broadside, right up alongside the truck. When they got me up over the bank, George Morning helped pull me. I was completely crippled in my left leg and I crawled to her, trying to hold this hand here that had been shot. I crawled to her. She never did speak. If she ever spoke, I don't know it. I heard her crying when I was over the bank, but she never did speak. One Jellico policeman and one Campbell County officer, when I came to, they were there. I looked up and saw her there. At that time Bill Ellison got there with the ambulance. He was there. I could see Bill Ellison and Harold Young and Gene Collins. Eulis, all this time was standing over there, loaded up."

The physician who examined Nancy at the hospital to which she was removed shortly after the shooting testified that she died of "multiple gunshot wounds of the anterior chest, neck and right shoulder region." He opined that the wounds were made by "multiple pellets."

KRS 70.040 states that "The sheriff shall be liable for the acts or omissions of his deputies." In Johnson v. Williams, Adm'r., 111 Ky. 289, 63 S.W. 759 (1901), we wrote "If the act from which the injury resulted was an official act * * * the sheriff is answerable", but the sheriff is not responsible for a personal act of his deputy. Many cases of this court so holding are listed in 1 A.L.R. 236 and 102 A. L.R. 182. This is the general rule. Also see 116 A.L.R. 1070. In 3 C.J.S. Agency § 258, p. 193, it is said "Where, however, the willful wrong of the agent is impelled by motives wholly personal to himself, the act is committed outside the scope of his authority and the principal is not liable for the tort." Also see City of Lexington v. Yank, Ky., 431 S.W.2d 892 (1968).

Sheriffs and their deputies are required to execute warrants of arrest as a part of their official duties. KRS 70.079 admonishes that:

"It shall not be a sufficient return of any process, that the officer was prevented by force from executing it."

In executing a warrant of arrest, the officer must inform the person named in the warrant of his purpose and the offense for which the arrest is being made. Then, he either places the subject in restraint or the subject voluntarily places himself in the custody of the officer. The officer has the duty not to use unnecessary force in making the arrest. KRS 431.025(3); Ad-

ler v. Com., 307 Ky. 471, 211 S.W.2d 678 (1948) ; 5 Am.Jur.2d 793, Arrest, Sec. 114. The person named in the warrant has the reciprocal duty to peacefully submit to arrest. Creighton v. Com., 83 Ky. 142, 4 Am.St.Rep. 143 (1885), quoted with approval in Keyes v. Com., 272 Ky. 628, 114 S.W.2d 742 (1937) ; Cornett v. Com., 198 Ky. 236, 248 S.W. 540 (1923). If the person named in the warrant offers force against the officer, the officer has not only the authority but the duty to complete the arrest. KRS 70.079. The officer may be held responsible in damages to the one he injures if he uses excessive force. 80 C.J.S. Sheriffs and Constables § 121, p. 329.

Here the claim is that excessive force was used. To recover Eugene must prove excessive force and its use in the performance of an official duty as distinguished from a personal act. In West v. Nantz, Adm'r., 267 Ky. 113, 101 S.W.2d 673 (1937), we said:

"However, if his deputy, Hood, exceeded his rights as an arresting officer in the discharge of his official duty, and inflicted the injuries on the deceased, Nantz, as charged * * * then his principal, West, would be responsible therefor personally, as well as on his official bond. See Johnson v. Williams' Adm'r, 111 Ky. 289, 63 S.W. 759, 23 Ky. Law Rep. 658, 54 L.R.A. 220, 98 Am.St. Rep. 416. Many other domestic cases following the rendition of that opinion have approved it without dissent."

■ Statements made by Eugene indicate that the deputies were acting in an official capacity which, if true, would impose liability on the sheriff. They had a warrant for the arrest of Eugene; they used their police flashing signal directing that Nancy bring the truck to a halt; they displayed the warrant and permitted Eugene to read it; they directed that he accompany them to jail. If the proof on a trial reveals these statements to be true facts—it will be incumbent upon the court to decide that they were acting officially on the oc-

casion in controversy. Indemnity Ins. Co. v. Bonta, 217 Ky. 265, 289 S.W. 231 (1926).

The next question to be resolved is whether greater force than necessary was used in wounding Eugene. Had his resistance to arrest ceased before the shot was fired? Was shooting necessary? A more difficult problem is presented with respect to the death of Nancy. Why was she shot and did her killing occur as a part of the arrest of Eugene? If not, was it so closely related by time or events to make it a part of official acts of the deputies? These are subjects to be developed at a jury trial. Grau v. Forge, 183 Ky. 521, 209 S.W. 369, 3 A.L.R. 642 (1919).

The sheriff relies on Howard v. Caudill, 228 Ky. 403, 15 S.W.2d 245 (1929), claiming that "a personal representative is not entitled to recover against the sheriff and his surety for death of a spouse killed by a deputy sheriff, where it is not alleged and proven that the sheriff committed the killing or that he aided or abetted in the killing." That case was not an action by a personal representative, but, on the contrary, by the surviving spouse. We held that in a suit so brought under KS 4 and 6, recovery would be denied unless the sheriff was a participant in the killing. Also see Casey v. Fidelity & Cas. Co., 278 Ky. 426, 128 S.W.2d 939 (1939). KRS 411.130, formerly KS 6, now provides that " * * * damages may be recovered for the death from the person who caused it, *or whose agent or servant caused it.*" (Italics supplied). Because of that change, Howard and Casey are inapplicable.

■ Appellees claim that Eugene made judicial admissions which preclude any recovery in that while at the hospital he remarked several times that he had killed his wife. We do not construe these statements to be judicial admissions exonerating the officers. See definition of Judicial Admission in Burgess v. Consider H. Willett, Inc., 311 Ky. 745, 225 S.W.2d 315 (1949).

Furthermore, they were not made in the course of these judicial proceedings.

Here summary judgment was inappropriate. See Yates v. Wilson Bros. Trucking Co., Ky., 471 S.W.2d 744 (decided Sept. 24, 1971), and the cases cited therein.

The judgment is reversed for further proceedings consistent herewith.

MILLIKEN, C. J., and PALMORE, REED and NEIKIRK, JJ., concur.

EDWARD P. HILL, Jr., and OSBORNE, JJ., concur in result.

EDWARD P. HILL, Jr., Judge (concurring in result).

I concur in the result but I would go further and hold that the sheriff should be held liable as master for the wrongful acts of his agents (his deputies) under our case laws pertaining to Master and Servant.

OSBORNE, J., joins with me in this separate opinion.