*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0010p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

LILER RAZOR GRIFFITH, Personal Representative of
the Estate of Arthur L. Partee, Deceased,
                                          *Plaintiff-Appellant,*

      *v.*

JIM COBURN, Police Chief for Benton Township;
TIM SUTHERLAND and WILLIAM BRADSHAW,
individually and in their capacity as Benton
Township Police Officers, and BENTON TOWNSHIP,
a municipal corporation,
                                          *Defendants-Appellees.*

No. 05-2720

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 04-00728—Robert Holmes Bell, Chief District Judge.

Argued: November 28, 2006

Decided and Filed: January 10, 2007

Before: DAUGHTREY and GIBBONS, Circuit Judges; EDMUNDS, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Amos E. Williams, Detroit, Michigan, for Appellant. G. Gus Morris, KUPELIAN, ORMOND & MAGY, Southfield, Michigan, for Appellees. **ON BRIEF:** George D. Lyons, Detroit, Michigan, for Appellant. G. Gus Morris, KUPELIAN, ORMOND & MAGY, Southfield, Michigan, James R. Nelson, NELSON, KREUGER & SCHROTENBOER, Hudsonville, Michigan, for Appellees.

_____

[*] The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of Michigan, sitting by designation.

———————————

## OPINION

———————————

MARTHA CRAIG DAUGHTREY, Circuit Judge.  The underlying claim in this civil rights action, brought under 42 U.S.C. § 1983, stems from the death of Arthur L. Partee during his arrest by two Benton Township (Michigan) police officers, defendants Tim Sutherland and William Bradshaw.  His estate sued the officers, Police Chief Jim Coburn, and the Township, alleging that Partee's death was caused by use of excessive force, in violation of his rights under the Fourth Amendment.  The district court granted summary judgment to all defendants, finding as to the arresting officers that there had been no showing that Partee had a clearly established right to freedom from "the use of the vascular neck restraint" or that the officers' use of what is commonly called a "choke hold" was objectively unreasonable, and as to Chief Coburn and the Township that the plaintiff had failed to make out a case of inadequate training.  The plaintiff now appeals, but only as to the ruling on Officer Sutherland's liability in this matter.[1]  We find that there are material disputes of fact concerning the reasonableness of his action in subduing Arthur Partee, and we therefore conclude that summary judgment on the claim against Sutherland must be reversed.

### *FACTUAL AND PROCEDURAL BACKGROUND*

Up to a point, the facts in this case are not in dispute.  The parties agree that the events that led to Arthur Partee's death began with his mother's trip to the Benton Township police department.  Because her son Arthur had been acting strangely, Ethel Partee went there seeking advice about having him hospitalized.  Officer Sutherland informed her that Arthur Partee could not be involuntarily committed for evaluation because he did not appear to be a danger to himself or others, but Sutherland did check to see if there were any outstanding warrants for Partee and discovered an outstanding traffic warrant for driving without a license.  He then offered to arrest Arthur Partee on the warrant so that he could then be evaluated, and Ethel Partee agreed to this arrangement.  She subsequently permitted defendants Bradshaw and Sutherland to enter the home she shared with her son.

When the officers arrived, Arthur Partee was sitting on a couch in front of the television.  He continued to sit there passively while the officers informed him of the warrant and requested his date of birth.  Partee declined to provide his date of birth, protested that the warrant was not for him, and then turned his attention back to the television, ignoring the officers but not resisting them in any way.  As he continued to sit staring at the television, one of the officers told him that "it would be foolish for him to fight with [them]."  The two officers then moved the coffee table from in front of the couch, which precipitated a struggle with Partee, the details of which are disputed – as outlined below.

At the end of the struggle, Partee lay handcuffed and face down on the ground.  His mother, having witnessed the entire interaction, realized that her son was in trouble at that point and implored the officers to help him.  In response, they told her that Partee was "just faking" and "playing possum."  The two officers finally turned Partee over and slapped him in the face, attempting to get him to respond.  When he did not, they removed his handcuffs and initiated CPR, but without success.  By the time medics were called and arrived at the residence, Partee was no longer breathing and had no detectable pulse. He was pronounced dead on arrival at a local hospital.

———————————

[1]At oral argument, counsel for the plaintiff withdrew the appeals as to Police Chief Coburn and Benton Township and conceded that summary judgment as to Officer Bradshaw was appropriate.  Those three parties have now been dismissed by stipulation.

Dr. Start, the medical examiner who performed Partee's autopsy, concluded that Partee's death was caused by "[a]sphyxia associated with physical restraint."[2] According to Dr. Start, a person can become unconscious with significant pressure applied to the neck in 15-20 seconds, and this pressure would need to be consistently applied for two to five minutes for death to result. Another doctor, Dr. Spitz, agreed with Dr. Start that the cause of death was physical restraint – specifically, the improper application of a neck restraint. Dr. Spitz testified that in order to produce death, a neck restraint would need to be maintained for two to three minutes.

### *Ethel Partee's Version of Events*

It is undisputed that Arthur Partee's mother, Ethel, was present during the entire interaction between the officers and her son and, indeed, needed to be told to "get back" at one point. According to Officer Bradshaw she was close enough to hand him the handcuffs during the struggle. Hence, there is little doubt that Ethel Partee was in a position to witness what occurred leading up to her son's fatal injury.

Ethel Partee testified that after the officers moved the coffee table that was in front of Arthur, Officer Sutherland took his handcuffs out while Arthur remained on the couch, leaning back but resisting only passively by "tr[ying] to put his arm behind his back and . . . refusing to help" or cooperate in any way with the officers' commands. She said that Officer Sutherland "all of a sudden" jumped on her son, put his arm around Arthur's neck, and began choking and wrestling him while Officer Bradshaw stood by watching. She described the struggle as continuing for a period of minutes, with her son crying for help before going limp. She said that Officer Sutherland threw Arthur's limp body onto the floor face down and both officers got on top of him to cuff him. She began screaming that "he was dead," but the officers told her that he was "just faking." When the officers turned Arthur Partee over and slapped him in the face he did not respond.

### *Officer Sutherland's Version of Events*

Officer Sutherland testified that when Arthur Partee was told of the warrant and asked about his date of birth, he was initially unresponsive and simply ignored the officers, neither cooperating nor fighting with them. He said that Partee remained withdrawn even after being told he was under arrest and ordered to stand up and be cuffed multiple times. Then, according to Sutherland, Partee "rushed towards" him when Sutherland took his handcuffs out but was immediately pushed back onto the couch. He said that both officers then struggled with Partee, each one trying to grab an arm and cuff it while Partee resisted by holding his arms close to his body and tried to get off the couch and get away.

Resisting the officers, Partee moved around on the couch, eventually rolling into a kneeling position with his torso leaning against the sofa and his arms tucked beneath his chest. In his handwritten report made within hours of the incident, Sutherland explained that he and Bradshaw "struggled for several minutes" with Partee before they were finally able to handcuff him. Sutherland added that "[a]t one point during the struggle [Partee] was able to unsnap one of [Sutherland's] two snaps that hold[] in [his] sidearm." However, the report did not mention the use

---

[2]The autopsy reports lists only one cause of death: "Asphyxia associated with physical restraint." It lists three additional "final diagnoses," including "[a]cute psychotic mania." The defendants attempt to attach significance to these additional diagnoses, but in light of expert testimony in the record, we conclude that they are not relevant to the dispositive issue in this appeal. For example, Dr. Start testified that he found multiple indications of lateral compression of the neck and that because acute psychotic mania does not manifest itself physically, this secondary diagnosis was based exclusively on Partee's history as conveyed by others. Dr. Start explained that psychotic mania can cause cardiac arrhythmia, which could have been a contributing factor to the death, but he stated without equivocation that "asphyxia [wa]s the primary cause of death."

of a neck restraint. Instead, Sutherland wrote, Partee "appeared to have some difficulty breathing" and then "just stopped breathing."

In his subsequent deposition, Officer Sutherland provided more detail. He said then that he had reached underneath Partee, trying to grab his arm and pull it out to cuff it but that his own arm became pinned beneath Partee's body. While his arm was immobilized, Sutherland said, he felt Partee reach back with his left hand and reach for his holstered gun. Officer Sutherland testified that he both felt and saw Partee's hand on his holstered gun and that as Partee pulled his arm back underneath his body, he unsnapped one or two snaps of the holster. Fearing that Partee was trying to pull his weapon out, Officer Sutherland said that he used a vascular neck restraint on Partee to cut off the flow of oxygenated blood to his brain. After restraining Partee for "two or three seconds," Sutherland said, he gained control of him and pulled him to the ground to be handcuffed.

According to Sutherland's deposition, once Partee was cuffed, he stopped to catch his breath and did not try to talk to Partee or to otherwise see if he was responsive. He said that Bradshaw and a third officer named Koza, who had arrived on the scene around the time Partee was cuffed, lifted Partee to his feet to take him to the squad car, but that Partee was unable to stand on his own. Although he noticed some blood on Partee, Officer Sutherland did not observe anything else abnormal about him and still did not attempt to communicate with him.

Sutherland said that when he did notice that Partee's breathing was deteriorating, he radioed for medics. He also agreed that Partee should be uncuffed, and he went to get a CPR kit from his car, returning to find that Partee was not breathing. He said that he initiated "rescue breathing" and, when he lost Partee's pulse, he performed full CPR.

### Officer Bradshaw's Version of Events

According to Officer Bradshaw, Sutherland instructed Partee to stand up from the couch and place his hands behind his back, and in response Partee stood up and "lunged" toward Officer Sutherland. Partee was pushed back onto the couch and the officers struggled with him in an effort to cuff him. The struggle entailed "[t]he resistance of [Partee] keeping his arms underneath his torso area."

Bradshaw testified that although he and Sutherland did not communicate with each other during the struggle, he was in close proximity to his partner throughout it and was in a position to see everything that was going on. However, Bradshaw testified that he did not see Partee reach out to grab Sutherland's weapon or unsnap his holster. In fact, Bradshaw did not see Partee extend his hand at any time except for once when Bradshaw forced it out from behind Partee's back to cuff it but was unable to do so. Bradshaw did not hear Sutherland say anything about Partee reaching for his gun or anything else indicating that Sutherland feared for his safety.

In his initial handwritten report made within hours of the incident, Bradshaw – like Sutherland – failed to mention use of a neck restraint; rather, he simply stated that Partee "was then struggled to the floor." Later, Bradshaw admitted that he saw Sutherland use the neck restraint on Partee. He was unable to recall how long Sutherland held Partee in the choke hold but estimated that it was only a matter of a few seconds. During the period of time when Sutherland was utilizing the neck restraint, Bradshaw said, he himself remained on Partee's opposite side, trying to get an arm to cuff. The neck restraint caused Partee to "go limp," according to Bradshaw, thereby enabling him to gain control of Partee's right arm and "take him to the ground."

Bradshaw further testified that when he and Koza attempted to lift Partee up, Partee neither helped nor resisted, and Bradshaw noticed Partee's breathing become faint. He said that when ammonia was placed under Partee's nose, he jerked back but then reverted to his previous state. He described how Sutherland rubbed Partee's sternum, an action designed to cause a pain reaction and

bring a subject out of unconsciousness, but Partee did not respond. He indicated that attempts at CPR were equally unsuccessful.

The district court granted summary judgment for all defendants based on qualified immunity, concluding that "[t]he use of the vascular neck restraint under the circumstances was not objectively unreasonable" because "[t]he undisputed facts of this case reveal that . . . Partee actively and physically resisted arrest" and, "[i]n addition, there is evidence that during the struggle Partee reached for Sutherland's gun." Given the startling discrepancies not only between the eyewitness testimony of Partee's mother, Ethel Partee, and that of the two officers, but also between the testimony of Sutherland and Bradshaw and between the officers' testimony and the forensic evidence presented by the medical experts, we conclude that the district court reached this conclusion only by making wholesale credibility determinations in favor of a single witness, Officer Sutherland. At one point, for example, the district court said in its opinion granting summary judgment to the defendants, "Contrary to Plaintiff's assertions, the credibility of Sutherland's testimony regarding the unsnapping of his holster is not undermined by his written report created shortly after the incident." The district court also concluded that even if Partee's constitutional rights had been violated, they were not clearly established rights, holding that "[t]here simply was no clearly established law prohibiting the use of the vascular neck restraint under the circumstances of this case."

## *DISCUSSION*

We review *de novo* the district court's grant of summary judgment. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In reviewing the record the court "must view the facts and any inferences reasonably drawn from them in the light most favorable to the nonmoving party." *St. John v. Hickey*, 411 F.3d 762, 768 (6th Cir. 2005) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Summary judgment is only appropriate if, viewing the facts and inferences in this light, evidence is so lacking that it would be impossible for "a reasonable jury [to] return a verdict for the nonmoving party." *Id.* (quotation marks and citations omitted).

The plaintiff brought suit under 42 U.S.C. § 1983, arguing that the defendant officers used excessive force against Arthur Partee in violation of his Fourth Amendment rights. "To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)) (additional citation omitted). Even when a claim is stated, however, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

In *Saucier v. Katz*, the Supreme Court established a two-pronged inquiry to determine an official's entitlement to qualified immunity in the context of an excessive force claim. *See* 533 U.S. 194, 200 (2001). First, the court must determine whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right." *Id.* at 201. If so, the court must then determine "whether th[at] right was clearly established on a . . . specific level." *Id.* at 200.

The Fourth Amendment guarantees citizens the right "to be secure in their persons" and protects "against unreasonable seizures" of a person. U.S. CONST. amend. IV. To determine whether an officer's use of force in effecting an arrest is excessive in violation of the Fourth Amendment, the court must apply an "objective reasonableness" standard. *See Graham v. Connor*, 490 U.S. 386, 388 (1989). Under this standard, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397 (citations omitted). The test is "reasonableness at the moment" of the use of force, as "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396 (citations omitted).

The reasonableness determination "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (quotation marks and citations omitted). The individual's interest in not having the particular force used against them is weighed against the officers' "interest in performing these actions, as gauged by 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Shreve v. Jessamine County Fiscal Court*, 453 F.3d 681, 687 (6th Cir. 2006) (quoting *Graham*, 490 U.S. at 396). Though these factors are important, they are not exhaustive, as the court must ultimately determine "'whether the totality of the circumstances justifies a particular sort of seizure.'" *St. John*, 411 F.3d at 771 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)).

Because determining reasonableness in this context is such a fact-intensive endeavor, summary judgment is improper if the legal question of immunity turns on which version of the facts is accepted, because then "the reasonableness of the use of force is the linchpin of the case." *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998) (citing *Brandenburg v. Cureton*, 882 F.2d 211, 215-16 (6th Cir. 1989)); *see also Cureton*, 882 F.2d at 215 (finding summary judgment inappropriate where detective claimed that weapon was pointed "'directly at us,' presumably proving that he or any officer would have a subjective belief in a threat of serious physical harm," because there were "facts which might indicate otherwise" and thus "a reasonable person might believe that [the] detective . . . acted unreasonably in firing the shot"). In short, "[w]here . . . the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability," and thus summary judgment should not be granted. *Sova*, 142 F.3d at 903 (citations omitted).

In the case before the court, the question of reasonableness – and thus the question of whether a constitutional right was violated – turns completely on which version of the facts one accepts. If Ethel Partee's account of the encounter is credited, *i.e.*, that Officer Sutherland almost immediately and without provocation jumped on Arthur Partee and began choking him, then the force used against Partee is objectively unreasonable. *Cf. Cureton*, 882 F.2d at 216 ("If the jury determines that [the officer] fired on [decedent] without a belief that someone was in danger of serious bodily injury, then as a legal matter no reasonable officer could believe that such gunfire would not violate another's constitutional rights.").

Sutherland's actions must be measured also in light of testimony regarding the training that he received in use of the neck restraint tactic. Although the Township had no written policy on the use of neck restraints, Officers Sutherland and Bradshaw both completed a police academy program that included certification in "Pressure Point Control Tactics," including neck restraints, taught by a certified instructor. The sole publication used in this training was the statewide standard and had been reviewed and accepted by the Michigan Law Enforcement Training Council, and the instructor had little discretion to stray from this manual. The training pertinent to neck restraints included reading the manual, in-class discussion, and hands-on training. Over several days the students practiced the technique on people of different sizes and in different situations.

The manual instructed students that "vascular neck restraints are justified when the officer's attempt at lower forms of subject-control have failed, or when the officer believes that lower forms of subject control would not be successful," and that the restraint "is designed to control high levels of resistance." The instructor likewise trained students on when "[t]his . . . high use of force" is appropriate." The certified trainer explained that the neck restraint is a technique that is to be used in situations such as where someone is being "violent" or assaulting an officer: "You wouldn't use this technique on someone who is just sitting there, and saying I'm not going; I'm not going to leave, you wouldn't use this force on someone who is not attacking you or anything. You're going to use this, again, for someone who is highly agitated, who is violent."

Police tactics are classified along a "force continuum" and, according to the certified instructor, the vascular neck restraint falls toward "the harder or the more violent part" of this continuum, probably beyond pepper spray, at the "point where you are using batons, or . . . tasers." Police Chief Coburn attested that he is absolutely certain that Officers Sutherland and Bradshaw had pepper spray on their persons when they arrested Partee and that they additionally should have had night sticks.

In light of the evidence about the neck restraint's position on the force continuum and the undisputed fact that Partee never actually had possession of Officer Sutherland's gun, let alone threatened anyone with it, we can only conclude that a jury could find Officer Sutherland's use of the neck restraint unreasonable, particularly in light of the mandate "[i]n this circuit . . . that a Fourth Amendment seizure must be effectuated with 'the least intrusive means reasonably available.'" *St. John*, 411 F.3d at 774-75 (quoting *United States v. Sanders*, 719 F.2d 882, 887 (6th Cir. 1983)); *see also id.* at 772 ("Even if there was evidence of resistance, it would be improper to determine whether the resistance justified the officers' actions because such a determination is for a jury in the first instance.").

There is one other relevant factor in this case: the record establishes that the officers who came to the Partee residence knew before their arrival that Arthur Partee was experiencing some sort of mental or emotional difficulty sufficient to cause his mother to seek help from the police department. In a recent Sixth Circuit case in which the first officer arriving on the scene was "informed . . . that [the subject] was mentally ill, but . . . not . . . that [he] was nonverbal and nonresponsive," *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 904 (6th Cir. 2004), we noted:

> It cannot be forgotten that the police were confronting an individual whom they knew to be mentally ill or retarded, even though the Officers may not have known the full extent of [his] autism and his unresponsiveness. The diminished capacity of an unarmed detainee must be taken into account when assessing the amount of force exerted. See *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir.2001) ("[W]here it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining . . . the reasonableness of the force employed."). For example, in *Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir.2003), officers handcuffed a mentally ill individual and leaned their body weight onto his upper torso. *Id.* at 1054. The officers then applied a hobble device. Drummond fell into respiratory distress and eventually a coma. *Id.* at 1055. The court held that the district court's grant of summary judgment on the basis of qualified immunity was not proper because the officers had violated Drummond's clearly established rights. *Id.* at 1062. It stated, "Any reasonable officer should have known that such conduct constituted the use of excessive force." *Id.* at 1061.

*Id.* at 904 (emphasis added).

Viewing the facts in the light most favorable to the plaintiff, we conclude that a reasonable jury could find that Officer Sutherland used excessive force. That leaves us to consider the second prong of the *Saucier* inquiry.

Even if a plaintiff can establish the violation of a constitutional right by an officer, he must additionally establish that the right was clearly established at the time of violation in order to avoid dismissal on the grounds of immunity. *See Saucier*, 533 U.S. at 202. To satisfy this second prong, "the right. . . must have been 'clearly established' in a . . . particularized . . . sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The dispositive question is "whether the defendants had 'fair warning' that their actions were unconstitutional." *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005) (citations omitted).

The mere fact that a court has not held the particular action in question unlawful is insufficient to create immunity. *See Anderson*, 483 U.S. at 640 (noting that the rule is *not* "that an official action is protected by qualified immunity unless the very action in question has been previously held unlawful") (citation omitted). Accordingly, "[n]ovel factual circumstances . . . do not automatically require a finding of qualified immunity." *St. John*, 411 F.3d at 774 (citations omitted). Rather, "[t]he Court can consider more than merely the factual context of a prior case: 'the general reasoning that a court employs' also may suffice for purposes of putting the defendant on notice that his conduct is clearly unconstitutional." *Id.* (citation omitted).

"Cases in this circuit clearly establish the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest." *Shreve*, 453 F.3d at 688; *see also St. John*, 411 F.2d at 774 ("the right of a nonviolent arrestee to be free from unnecessary pain knowingly inflicted during an arrest [i]s clearly established"). However, the district court, relying on the Supreme Court's decision in *Brosseau v. Haugen*, 543 U.S. 194 (2004) (*per curiam*), concluded that the plaintiff failed to show a sufficiently specific clearly established right.

In *Brosseau* the Supreme Court held that an officer was entitled to qualified immunity for shooting "a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area [we]re at risk from that flight." *Id.* at 200. This holding was based on a determination that no clearly established law prohibited this use of force under the particular circumstances, and that this case was not one in which the general law barring the use of excessive force did not "obvious[ly]" give fair warning. *Id.* at 199. The Court noted that case law had established that no Fourth Amendment violation occurs "when an officer sho[o]t[s] a fleeing suspect who present[s] a risk to others." *Id.* at 200 (citations omitted).

*Brosseau* is fundamentally distinct from the present case. In *Brosseau* there was no factual dispute about the reasonableness of the officer's belief that the suspect posed risk to others. In fact, the plaintiff had already "pleaded guilty to the felony of 'eluding[,]' . . . . [and b]y so pleading, he admitted that he drove his Jeep in a manner indicating 'a wanton or wilful disregard for the lives . . . of others.'" *Id.* at 197 (citations omitted); *see also id.* (Brosseau "later explained that she shot Haugen because she was 'fearful for the other officers on foot who [she] believed were in the immediate area, [and] for the occupied vehicles in [Haugen's] path and for any other citizens who might be in the area.'" (citation and additional quotation marks omitted) (alterations in original)); *Smith v. Cupp*, 430 F.3d 766, 776 (6th Cir. 2005) ("*Brosseau v. Haugen* does not preclude this court from finding the right at issue was clearly established because the *Brosseau* Court said that undisputed facts showed that the shooting officer believed the suspect had a gun and was fearful for officers in the immediate area.").

When the facts in this case are viewed in the light most favorable to the plaintiff, it is clear that Partee posed no threat to the officers or anyone else. It follows that the use of the neck restraint

in such circumstances violates a clearly established constitutional right to be free from gratuitous violence during arrest and is obviously inconsistent with a general prohibition on excessive force. Indeed, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted," *Saucier*, 533 U.S. at 202, and if the jury concludes that Officer Sutherland used the neck restraint without an objectively reasonable belief that Partee posed a threat of serious bodily injury, then it is obvious to us that "no reasonable officer could believe that such [use of force] would not violate another's constitutional rights." *Cureton*, 882 F.2d at 216.

## *CONCLUSION*

For the reasons set out above, we conclude that there are significant disputes of material fact concerning the reasonableness of Officer Sutherland's use of a choke hold on Albert Partee. Summary judgment was inappropriately entered as to Sutherland, and we therefore REVERSE that portion of the district court's judgment and REMAND the case for further proceedings.