**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 18a0573n.06

Case No. 17-6436

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>ESTATE OF BILLY COLLINS, JR.,</td><td>)</td><td rowspan="11"></td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>Plaintiff-Appellant,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>v.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>STEPHEN WILBURN, et al.,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>Defendants-Appellees.</td><td>)</td></tr>
</table>

**FILED**
Nov 15, 2018
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY

BEFORE: SILER and KETHLEDGE, Circuit Judges; OLIVER*, District Judge

SILER, Circuit Judge. Billy Collins, Jr. was arrested for driving on a suspended license and disorderly conduct in Louisa, Kentucky by Sergeant Stephen Wilburn of the Louisa City Police Department. Collins was combative throughout the encounter, initially by shouting and cursing, and later by disobeying direct officer orders and becoming violent and aggressive with Wilburn and other officers. Over the course of the interaction, officers made at least four Taser deployments, but only the final deployment was effective in subduing Collins, when he was brought to the ground face down and handcuffed. When Collins was rolled on his side and brought to a seated position, officers noted he had a pulse and was breathing but was verbally unresponsive.

---

* Hon. Solomon Oliver, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

First responders performed CPR and transported Collins to the hospital, where he was pronounced dead. His son, as administrator of the estate, brought suit.

The district court granted summary judgment in defendants'[1] favor, holding inter alia that the individual defendants were entitled to qualified immunity and that sovereign immunity barred the estate's state-law claims against the City of Louisa. The grant of qualified immunity was sound, and while the estate attacks the grant of sovereign immunity, an independent, fully briefed argument in the record supports the grant of summary judgment. We AFFIRM.

I.

In 2015, Sergeant Wilburn was working a local high school graduation; as traffic was released, Wilburn was informed by Police Chief Fugitt that a truck had been driven into a ditch nearby. Wilburn approached the vehicle, encountered Collins, and asked what was going on and how he ended up there. Wilburn obtained Collins's license, insurance information, and ran his tags, which revealed that Collins was driving on a suspended license.[2] Wilburn also looked into Collins's truck and observed a bucket of beer sitting in the passenger's seat and open empty beer cans and bottles in the back of his truck. While Wilburn did not smell any alcohol on Collins, he did conduct a field sobriety test to determine whether Collins was under the influence. Although Wilburn did not observe any physiological indications of alcohol intoxication, Collins screamed and cursed at people going by during the course of the field sobriety test and disregarded Wilburn's repeated instructions not to do so.

---

[1] The estate sued groups from both the LPD and Lawrence County Sheriff's Office; this appeal is taken only from the grant of summary judgment as to the Louisa-side defendants.

[2] The estate repeatedly attempts to minimize the fact that Collins's license was suspended, including characterizing the offense as a "minor traffic violation." However, as Sergeant Wilburn testified, while officers can merely cite someone for driving on a suspended license, they normally arrest for the offense.

Wilburn therefore arrested Collins for disorderly conduct and operating on a suspended license. Wilburn decided not to handcuff Collins for transport to the police station; Collins agreed to sit in the back of Wilburn's police cruiser and cooperate if he wasn't handcuffed. However, by the time the pair arrived at the police station, Collins repeatedly refused to get out of the car and cursed at Wilburn. Collins eventually acquiesced, saying "something to the effect of 'Fuck you motherfucker, I guess I'll go.'" As they walked up the ramp to the back door of the police station, Collins grabbed the ramp's railing, began yelling and cursing at both Wilburn and people across the street, and refused to let go despite Wilburn's repeated instructions to do so. It was at this time that Wilburn activated his body camera.

Wilburn attempted to handcuff Collins to get him inside, but was only able to handcuff his left wrist before Collins tensed up and pulled his arm away.[3] Wilburn warned Collins that if he didn't let go, Wilburn would use his Taser, stating, "I'm gonna light you up. Let go of the rail right now. We can do this easy or hard, come on. Billy?" Collins remained combative, yelling, "Bullshit! You ain't my goddamn boss![,]" "You better let the fuck go of me. I'm fixing to get pissed off. I'm gonna get pissed off. You ain't gonna like it[,]" and "Why don't you go ahead and get mad. Go and get mad. I want you to get mad. Get mad, boy. Go ahead." Wilburn continued to instruct Collins to "come on" and release his grip on the rail. He then radioed Officer Miller to confirm he was on his way to provide backup. Wilburn again requested that Collins "let go of the banister," which Collins again refused, responding, "Fuck you."

Officer Miller arrived at that point, as Wilburn continued to warn Collins that he would be tased if he did not release his grip on the railing; Collins continued to refuse, even asking Miller to "Get [Wilburn] off me. I ain't going." Wilburn then delivered a "drive-stun" tase to Collins's

---

[3] Wilburn testified that a handcuff attached to only one wrist can be used as a weapon.

shoulder; Collins released the railing, swung and missed at Wilburn's face, and struck Wilburn in the chest, knocking Wilburn back. Miller, who did not see the drive-stun Taser deployment due to his perspective, deployed his own Taser at Collins. Although the probes struck Collins, they were ineffective, as Collins simply removed either the probes or the wires.

Staggering back, Collins went through the door into the police station and closed the door behind him. Wilburn then requested additional backup. Collins barricaded himself in the foyer of the police department by holding one hand against the door, preventing the officers' efforts to push the door open. Keefer then arrived to provide backup. As Wilburn testified, weapons were accessible within the department through closet doors that could be kicked down, as well as readily available makeshift weapons including chairs, staplers, and scissors, in addition to the handcuff on Collins's wrist. The officers decided to try to open the door as wide as possible to allow Keefer to attempt to deploy his Taser; Collins again simply removed the wires and was unfazed by Keefer's efforts to cycle the Taser again while the wires were in Collins's hand. Collins then slammed the door shut again and began banging on the door's glass pane. Sheriff's Deputy Douglas Wilhite arrived as additional backup.

Wilburn realized he had a key to the back door and informed the other officers he would gain entrance and approach Collins from behind. Wilburn ran to the back, entered, and positioned himself outside the foyer where Collins was barricaded. When Wilburn came through the door behind Collins, Collins was still holding the outside door shut, hitting the glass, and "being aggressive towards the other officers." Wilburn successfully deployed his Taser, the probes making contact with Collins's back. Collins, however, refused to go to the ground, despite Wilburn's instructing him to do so five times.

The other officers were able to enter the door Collins had been holding shut and—following a "closed hand strike to Collins['s] face" by Keefer—brought Collins to the ground, face down. Collins then refused multiple orders to put his hands behind his back to be handcuffed, and Wilburn cycled his Taser again. Keefer thus employed "closed strikes" with his baton as Miller employed closed empty hand strikes to attempt to gain control of Collins's arms, and Miller, Keefer, and Wilhite used their batons to pry his hands out from underneath his body.

The officers successfully secured Collins's hands in the original set of handcuffs, cuffed together with a second set applied to his right wrist, declared the situation safe, and, when Keefer "observed Collins['] face turning dark," rolled Collins onto his side and sat him upright. Although Collins had a pulse and was breathing, he was unresponsive, and was "mumbl[ing], but he wasn't making accurate words." The officers called for EMS to respond, but members of the Louisa Fire Department arrived first and began administering CPR to Collins. EMS arrived shortly thereafter and transported Collins to Three Rivers Medical Center where he was pronounced dead.

Following an autopsy, the Kentucky Medical Examiner attributed Collins's death to atherosclerotic cardiovascular disease and noted that cardiomegaly, emphysema, and physical struggle were contributory to the death but did not result in the atherosclerotic cardiovascular disease. The autopsy report also included photographs, and a discussion of injuries including abrasions on the head, periorbital ecchymosis, a laceration on the right upper eyebrow, and contusions on the forehead and scalp; however, no fractures or evidence of acute trauma were found in the neuropathology report.

The estate filed suit in Lawrence County Circuit Court against Wilburn, Miller, Fugitt, Keefer, Wilhite, as well as the Lawrence County Sheriff, the Louisa Police Department, the Lawrence County Sheriff's Office, the City of Louisa, Lawrence County, and unknown

defendants. It alleged, inter alia, that: (1) defendants violated Collins's Fourth Amendment right to be free from unreasonable use of force; (2) Chief Fugitt failed to properly train and supervise his subordinates; (3) the officers were negligent in their use of force under Kentucky state law; and (4) the City of Louisa and the LPD should be held vicariously liable for such violations. The defendants jointly removed the case, and moved for summary judgment.

The district court granted summary judgment in defendants' favor, inter alia, on the basis of qualified immunity as to the individual defendants and sovereign immunity as to the City of Louisa.

## II.

Typically, we review a district court's grant of summary judgment de novo, "construing the evidence and drawing all reasonable inferences in favor of the nonmoving party." *Rocheleau v. Elder Living Constr., LLC*, 814 F.3d 398, 400 (6th Cir. 2016) (citation omitted). However, in cases where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it," including cases involving video evidence, the court instead "view[s] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380-81 (2007); *Rudlaff v. Gillispie*, 791 F.3d 638, 639 (6th Cir. 2015) (citations omitted). "The key issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Rocheleau*, 814 F.3d at 400 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

## III.

## A.

"The doctrine of qualified immunity protects government officials [performing discretionary functions] 'from liability for civil damages insofar as their conduct does not violate

clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). After a defense of qualified immunity is raised, the burden shifts to the plaintiff to demonstrate that the defendants violated a right that was so clearly established "that every 'reasonable official would have understood that what [they were] doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (cleaned up). We ask two questions, in interchangeable order, in examining claims of qualified immunity: (1) do the facts as the plaintiff has alleged or shown make out a violation of a constitutional right; and (2) was the right at issue "clearly established" at the time of defendant's alleged misconduct. *Pearson*, 555 U.S. at 232.

Claims of excessive force in the course of an arrest implicate an arrestee's Fourth Amendment right to be free from unreasonable searches and seizures and are analyzed under the "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388, 394-95 (1989). "The test is 'reasonableness at the moment' of the use of force, as 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Griffith v. Coburn*, 473 F.3d 650, 656 (6th Cir. 2007) (quoting *Graham*, 490 U.S. at 396) (internal citations omitted). Evaluating the use of force involves consideration of the totality of the circumstances, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396-97 (citation omitted). "In determining whether there has been a violation of the Fourth Amendment, we consider not the 'extent of the injury inflicted' but whether an officer subjects a detainee to 'gratuitous violence.'" *Miller v. Sanilac Cty.*, 606 F.3d 240, 252-

53 (6th Cir. 2010) (quoting *Morrison v. Bd. of Tr. of Green Twp.*, 583 F.3d 394, 407 (6th Cir. 2009) (citation omitted)).

The estate argues the force used by the officers was objectively unreasonable and therefore excessive. It asserts the bodycam video shows: (1) Collins incapacitated by the use of the Taser, being deprived of the ability to comply with the officers' commands, and moaning while being pinned face down on the floor; (2) "that once he was subdued he was no longer resisting"; and (3) "multiple strikes while Collins is motionless with the weight of several officers on him." Taken together with the autopsy photographs, the estate argues the record "demonstrate[s] that there was significant head trauma[,]" which "creates an issue of fact as to whether or not excessive force was utilized once good contact was made with the [T]aser and [Collins] was subdued while on the floor." Defendants contend that the estate has missed the "crucial distinction" between a genuine dispute of material fact—which would preclude summary judgment—and a mere "competing interpretation of *undisputed* facts."

The estate's position regarding the events depicted on the bodycam footage is not supported by the record, including the video itself as well as the testimony of the officers, who all characterized Collins as continuing to be noncompliant once he was brought to the ground, namely by failing to release his arms from under his body to be handcuffed. We have found that active resistance includes "physically struggling with, threatening, or disobeying officers[,]" *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495 (6th Cir. 2012), as well as refusing to allow oneself to be handcuffed when coupled with disobedience of officer orders or threatening behavior. *Caie v. W. Bloomfield Twp.*, 485 F. App'x 92, 94, 96-97 (6th Cir. 2012). Despite the estate's protestations at the self-serving nature of the officers' testimony, based on the record before us, the district court's finding that no genuine dispute of material fact has been raised as to whether Collins was

actively resisting arrest is correct. *Cox v. Ky. Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("[A] nonmoving party may not avoid a properly supported motion for summary judgment by simply arguing that it relies solely or in part upon credibility considerations or subjective evidence. Instead, the nonmoving party must present affirmative evidence to defeat a properly supported motion for summary judgment." (citation omitted)).

Where video shows an arrestee actively resisting and refusing to be handcuffed, officers do not violate his Fourth Amendment rights by using force—such as a knee strike and a Taser deployment—in subduing him. *Rudlaff*, 791 F.3d at 639, 642-43.

The estate insists that "a lesser degree of force is reasonable when the offense is a misdemeanor and not a violent offense." This argument conveniently ignores the two other *Graham* factors, which here include the violence Collins demonstrated in the course of his arrest, including punching Wilburn, and his active resistance to officers' attempts to subdue him.

As held in the district court, the estate has failed to establish a violation of Collins's clearly established constitutional rights based upon the officers' use of excessive force. Therefore, the grant of qualified immunity will be affirmed.

B.

The estate contends that even in the event we affirm the district court's grant of qualified immunity to the individual officers, the estate's state-law claims should survive because the grant of *sovereign* immunity to the City was improper. Defendants apparently do not contest that sovereign immunity was granted in error but argue we should affirm on alternate grounds supported by the record—namely, that because the individual officers are entitled to qualified official immunity as a matter of law, no vicarious liability as to Louisa can attach. [Appellee's Br. 44-53.] Defendants are correct that when reviewing summary judgment, we may affirm on any

grounds supported by the record, including their fully-briefed qualified official immunity argument. *Pahssen v. Merril Cmty. Sch. Dist.*, 668 F.3d 356, 362 (6th Cir. 2012).

Similar to qualified immunity in the federal context, qualified official immunity under Kentucky law offers immunity from tort liability to public officers for acts performed in the exercise of their discretionary functions. *Yanero v. Davis*, 65 S.W.3d 510, 521-22 (Ky. 2001). As explained in *Yanero*, "[q]ualified official immunity applies to the negligent performance by a public officer or employee of (1) discretionary acts or functions, *i.e.*, those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment; (2) in good faith; and (3) within the scope of the employee's authority." *Id.* at 522 (citations omitted). As most acts contain both discretionary and ministerial components, the court's "analysis looks for the *dominant* nature of the act." *Haney v. Monsky*, 311 S.W.3d 235, 240 (Ky. 2010) (emphasis in original).

Under Kentucky law, a peace officer is not allowed to use unnecessary force or violence in making an arrest, but rather may "use such force as is necessary, or reasonably appears so, to take a suspect into custody." KRS § 431.025(3); *Haugh v. City of Louisville*, 242 S.W.3d 683, 686 (Ky. Ct. App. 2007) (citing *City of Lexington v. Gray*, 499 S.W.2d 72, 74 (Ky. 1973)). Further, "all persons have a legal duty to surrender to lawful arrest." *Haugh*, 242 S.W.3d at 686 (citing *Lawson v. Burnett*, 471 S.W.2d 726, 729 (Ky. 1971)). "[T]he determination of the amount of force required to effect the investigatory stop or arrest is . . . a discretionary act within the scope of a peace officer's authority." *Smith v. Norton Hosps., Inc.*, 488 S.W.3d 23, 31 (Ky. Ct. App. 2016) (citing *Nichols v. Bourbon Cty. Sheriff's Dept.*, 26 F. Supp. 3d 634, 642 (E.D. Ky. 2014); KRS § 503.090). "Once the officer . . . has shown *prima facie* that the act was performed within the scope of his/her discretionary authority, the burden shifts to the plaintiff to establish by direct or

circumstantial evidence that the discretionary act was not performed in good faith." *Yanero*, 65 S.W.3d at 523 (citing *Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991)).

The reply brief did not address defendants' qualified official immunity argument. In the district court, the estate made only a cursory reference to the application of qualified official immunity, arguing without additional support that the actions at issue in this case were of a ministerial, rather than discretionary, function, and was silent as to good faith. As the actions were performed within the scope of the officers' discretionary authority, we therefore conclude that defendants are entitled to qualified official immunity due to the estate's failure to meet its burden to produce direct or circumstantial evidence that the act was not performed in good faith. The estate's claim for vicarious liability against the City of Louisa therefore fails, as no vicarious liability attaches without underlying primary liability. *Haugh*, 242 S.W.3d at 687 (citing *City of Louisville v. Bergel*, 610 S.W.2d 292, 293 (Ky. 1980)).

## IV.

The estate has failed to meet its burden to point to specific, affirmative evidence in the record demonstrating why defendants should not have been granted summary judgment. There is simply no evidence that the officers involved in Collins's arrest violated his rights under federal constitutional or state law.

AFFIRMED.